J. EDWARD REED AND CLAIRE B. REED, DOING BUSINESS AS REED CONSTRUCTION COMPANY, ET AL., APPELLEES, V. LOWELL J. WILLIAMSON ET AL., APPELLANTS.

82 N. W. 2d 18

Filed March 22, 1957. No. 34065.

*Torgeson, Halcomb & O'Brien, John Knapp, P. M. Everson,* for appellants.

*Van Steenberg & Myers, George P. Burke,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

This is an injunction action to prohibit appellants from trespassing on the part of Sunny View Heights Addition to Kimball, Nebraska, which is subject to and affected by restrictive covenants, from drilling oil and gas wells thereon, and for general equitable relief.

The following are the circumstances of this litigation:

Gus Rieseberg, referred to as appellant, was the owner of the northeast quarter of the northeast quarter of Section 32, Township 15 North, Range 55 West of the 6th P. M., in Kimball County, which he platted as Sunny View Heights Addition to Kimball on August 12, 1949. He sold and conveyed to J. Edward Reed and Claire B. Reed, husband and wife, as joint tenants, on March 3, 1953, Lots 3 to 8, inclusive, Block 1 of the addition subject to the reservation expressed in the deed "Save and except, however, the oil, gas and other minerals in, on and under said real estate which are reserved to the grantor, his heirs and assigns forever * * *." Appellant, by contract in writing, on March 27, 1953, sold to and J. Edward Reed purchased Block 1 except Lots 1 to 8, inclusive, and Block 2 of said addition subject to the reservation of oil, gas, and other minerals quoted above. The original plat of the addition was vacated on May 29, 1953, the area of the addition was replatted as Sunny View Heights Addition to Kimball, it has since been in existence, and the last plat is the one referred to in this cause.

Appellant, J. Edward Reed, and Claire B. Reed on August 27, 1953, executed and acknowledged an instrument which was by its title characterized as "RESTRICTIVE COVENANTS." It was filed September 1, 1953, and recorded in the public records of Kimball County in the office of the county clerk. It recited that the persons who executed it were the owners of the addi-

tion except the west 165 feet of Block 4 and that they desired to assure persons who acquired lots in the addition that the real estate therein would be used only for certain purposes and in a certain manner. It was made applicable to all the addition except the west 164 feet of Block 4 owned by E. E. Brown on which a house had been constructed and all of Block 5 owned by appellant on which a residence had been built. The instrument consists in part of the following:

"NOW THEREFORE the undersigned Gus Rieseberg, single; J. Edward Reed and Claire B. Reed, husband and wife, do hereby covenant and agree with each and every person who shall hereafter acquire any portion of the above described real estate that: * * *

"2. All of the lots in said Addition shall be exclusively a residential area with the exception of Blocks 1 and 2 and lots 1, 2, 3 and 4 of Block 3 in which commercial development will be permitted, restricted however, to businesses which are either of a retail or professional nature.

"3. That the only buildings which may be erected in said Addition except on those lots where commercial development is permitted shall be either a detached single family dwelling with at least one or more stories above the ground level or a one or two car garage or the equivalent of the latter for exclusive use of storage of furniture, lawn tools, etc, used in ordinary living or maintenance of property. * * *

"5. That no dwelling shall be erected with less than 768 square feet of floor space at or above the ground level.

"6. No trade or activity shall be carried on which will constitute an annoyance or nuisance or which may be offensive or objectionable to the neighborhood. * * *

"It is expressly understood and agreed that these covenants are to run with the land and shall be binding upon each and every person hereafter acquiring an interest in and to any portion of the above described real

estate and they shall be in full force and effect for a period of forty years from and after the first day of June, 1953."

The instrument was joined in by appellant at the solicitation of J. Edward Reed. There was no money or other thing of value given the former by the latter at the time it was executed except as evidenced by the terms of the instrument. Appellant then owned no part of the surface estate of the real estate affected by the instrument except he had the legal title to the part thereof described in the contract of sale and purchase made on March 27, 1953, by him and J. Edward Reed and appellant was entitled to retain the legal title thereto until the unpaid part of the purchase price thereof was satisfied. There was a continuous contract relationship between appellant and J. Edward Reed at all times important to this case.

The contract of March 27, 1953, was canceled by the parties thereto and a new one was made May 27, 1954, containing the reservation to appellant of all oil, gas, and other minerals in, on, or under the real estate. Deeds of the surface estate were made and delivered as required by the contracts. The last deed bears date of February 24, 1955, after this litigation was commenced. Each of the deeds contained reservation in appellant of the oil, gas, and other minerals by the use of the language above set out.

On September 16, 1954, appellant executed and delivered to Lowell J. Williamson, hereafter mentioned herein as lessee, an oil and gas lease of all the real estate first described herein except the west 165 feet of Block 4 of the addition which was owned by E. E. Brown who is not a party to this case. The lessee, or persons acting for him, about January 3, 1955, went upon Lot 10, Block 14 of the addition, without permission, for the purpose of staking a location on which to drill a test well by virtue of the lease given thereon by ap-

pellant. He or they were ordered from the premises and this litigation was instituted.

Gus Rieseberg and Lowell J. Williamson, collectively designated appellants herein, offered at the trial to be bound by and to comply with ordinance No. 140 of Kimball as though it were a contract between them and persons interested in property in the addition. The ordinance was not passed until January 17, 1955, after this litigation was commenced.

J. Edward Reed, hereafter designated Reed, financed the housing project he developed on the premises he bought from appellant through the Prudential Insurance Company of America, hereafter called insurance company, by loans made by it and guaranteed by the Federal Housing Administration, designated herein FHA. The negotiations for financing the project had their inception about May 15, 1953, when FHA was advised of the proposed plans of the project. FHA would not have insured loans on property in the addition in the absence of restrictive covenants as suggested in an outline issued by it for development of single-family, detached dwellings. The first sentence of Requirement 1 of the FHA outline for that class was: "No lot shall be used except for residential purposes." The first loan application submitted by Reed was June 23, 1953, prior to the execution of the restrictive covenants by him and appellant, and the commitment of the insurance company was made July 14, 1953, but it was conditioned upon restrictive or protective covenants being secured before the loan was closed. A temporary injunction was granted January 4, 1955, by the district court which prohibited appellants from going upon the premises and exploring for oil and gas. There had been loaned prior thereto on property in the addition $93,000. Loaning on property therein had been discontinued until the injunction was procured, but subsequent thereto the insurance company loaned on property in the addition $162,600.

Appellant offered proof that the reasonable value of

the mineral estate in the 40 acres comprising the addition was $400,000. Appellee produced evidence that the leasehold interest was worth $225 to $250 per acre for the 40-acre tract. Reed had expended on the addition between $50,000 and $60,000. The value of the houses constructed on the addition by Reed was $430,000.

The interveners, except the insurance company, are purchasers from Reed of residences within Sunny View Heights Addition and the relief they seek is identical with the relief asked by Reed. The district court did not obtain jurisdiction of the person of any of the defendants named in the petition except appellant and the lessee who are the appellants in this court.

The district court found generally for appellees and against appellants; that the use of the property involved for drilling oil wells is prohibited by the restrictive covenants entered into by Reed, his wife, and appellant; that by the execution of the restrictions contained in the covenants appellant abandoned his easement for entry upon the premises to explore for oil and gas; and that the bar thereof against appellant extends to his successors in interest. The judgment rendered permanently enjoined appellants and their successors from trespassing on the premises and from drilling oil and gas wells thereon. That judgment is the subject of this appeal.

In the instance of the sale and conveyance of a surface estate the law implies a means for providing the benefit of the mineral estate. It is the rule that if the surface estate and the mineral estate are separated, the law implies a means of access to permit the owner of the mineral estate to have the benefit of it. A conveyance of the surface of the land or the reservation of the oil and gas in place contains an implied reservation of a right of access to the severed estate below. This is expressed in MacDonnell v. Capital Co., 130 F. 2d 311: "There is, apparently, complete unanimity amongst the various jurisdictions as regards the rule that an expressed

mineral reservation contained in a deed carries with it, by necessary implication, the right to remove such minerals (including gas and oil) by the usual or customary methods of mining and thus reduce them to possession even though the surface ground may be wholly destroyed as a result thereof." See, also, Annotation, 146 A. L. R. 901. It was the right described in the above of access to and use of the surface estate that the trial court found appellant abandoned when he executed and delivered the instrument containing the restrictive covenants.

The problem indispensable to the decision of this case is the meaning and effect of the language of the instrument entitled "RESTRICTIVE COVENANTS" executed by appellant that "All of the lots in said Addition shall be exclusively a residential area * * *."

In Carr v. Trivett, 24 Tenn. App. 308, 143 S. W. 2d 900, the court said: "A restrictive covenant providing that conveyed property should not be used except for 'residential purposes' and that no building should be erected thereon to be used for purposes of any trade, manufacture, or other business was unambiguous and could not be construed otherwise than as a prohibition against use of property for any purpose other than residential." In the opinion it is stated: "While restrictive covenants are to be strictly construed and will not be extended by implication to include limitations upon the free use of the property not plainly prohibited by the terms of the deed * * * such restrictions are to be given a fair and reasonable meaning so as to ascertain the intention of the parties * * *. The restrictive clause here under consideration is clear and unambiguous and cannot be reasonably construed otherwise than as a prohibition against the use of the property for any purposes other than for residential purposes."

The court in Briggs v. Hendricks (Tex. Civ. App.), 197 S. W. 2d 511, considered a restriction that all lots in the tract should be known and described as residential lots

except the portion designated as a business center, and that no structure should be erected on any residential building plot other than for detached family dwelling and other outbuildings incidental to the residential use of the plot. In reference thereto the court said: "Courts judicially know that the purpose of restricting lots in additions to cities to residential use is to establish an area free from commercial activity, and thereby enhance the value of such lots as residential property. The word 'residential' as used in a covenant restricting the use of property, is used in contradistinction to 'business' or 'commerce.' "

Hunt v. Held, 90 Ohio St. 280, 107 N. E. 765, L. R. A. 1915D 543, Ann. Cas. 1916C 1051, considered a restriction that the property was sold for residence purposes only and therein this observation is made: "But is there any doubt as to the meaning of the words? The word 'residence,' as we view it, is equivalent to 'residential' and was used in contradistinction to 'business.' * * * The word 'residence' has reference to the use or mode of occupancy to which the building may be put."

The opinion in West Nichols Hills Presbyterian Church v. Folks, — Okl. —, 276 P. 2d 255, uses this language: "We think the terms of the restrictions before us are clear and unambiguous. The use of the land for 'residence purposes only' means that the lots shall be used for residences and for no other purpose, and the recital of certain specific uses which are prohibited for the entire eight blocks, but failing to specifically forbid parking for those attending a nearby church, does not nullify or in any way effect (affect) the clearly expressed intention of the dedicator that the lots involved here shall be used for residence purposes only."

In Jernigan v. Capps, 187 Va. 73, 45 S. E. 2d 886, 175 A. L. R. 1182, the court said: "It is not necessary that we go to a dictionary or a law book to ascertain the meaning of 'a residential building.' Giving the words their plain and ordinary meaning, we would say that

such a building is one which is used for residential purposes,—that is, one in which people reside or dwell, or in which they make their homes, as distinguished from one which is used for commercial or business purposes. But if the obvious must be supported by authority or judicial precedent, we find that they are of the same view. Webster's New International Dictionary, 2d Ed., defines 'residential' as: 'Used, serving, or designed as a residence or for occupation by residents; * * *. Adapted to, or occupied by, residences; as, a residential quarter.' "

Moore v. Stevens, 90 Fla. 879, 106 So. 901, 43 A. L. R. 1127, decided: "The covenant under which appellee claims the right to injunctive relief is the one which provides that appellant's property 'is to be used for residence purposes only.' There is no ambiguity in the quoted expression, nor doubt as to its meaning, when considered in the light of the entire transaction in which it was used and its component words are accorded their ordinary, well understood meaning. The word 'residence' is one of multiple meanings, but the context in which it is used in this instance clearly indicates its meaning to be a dwelling house where a person lives in settled abode. The word, in this instance, relates solely to the use or mode of occupancy to which the property may be put. * * * When so employed and understood, it necessarily excludes all uses of the property other than for residence purposes, and the interposition of other negative terms specifically prohibiting the use of the property for business, mercantile or other similar purposes are unnecessary."

Southwest Petroleum Co. v. Logan, 180 Okl. 477, 71 P. 2d 759, concerned a part of Lincoln Terrace Addition to Oklahoma City. There were three plats of different parts of the addition. Attached to each was a certificate of the owner. The first and second each specified: "All lots in this plat are restricted to residences only * * *." The certificate attached to the last plat recited: "All

lots in this plat are restricted to dwellings only." The court said: "A valid restriction that 'All lots in this plat are restricted to residences only' prevents the use of such property for the drilling of oil and gas wells." This language appears in the opinion: "The question then narrows to one of interpretation of the clause, 'All lots in this plat are restricted to residences only,' or 'to dwellings only.' Both terms will be considered as synonymous. We are not unmindful of the rule that restrictions on the use of real property must be construed strictly. * * * Nevertheless they will be enforced in a proper case and will not be extended on the one hand or limited on the other, but strictly enforced. * * * The phrase 'All lots in this plat are restricted to residences only' excludes all other uses upon the land, and is clear and unambiguous. Under the natural and common sense meaning of the term 'residences' we cannot say that the drilling of wells for oil and gas is a use of property for residence purposes. It does not matter that the parties did not anticipate the oil development in this area and contemplate the necessity of excluding the drilling of oil wells in the addition when it is clear that they intended to exclude every use not pertaining to residence purposes." Smith Oil Co. v. Logan, 180 Okl. 474, 71 P. 2d 766, is a companion case of the one last quoted. State ex rel. Marland v. Phillips Petroleum Co., 189 Okl. 629, 118 P. 2d 621, approves the conclusion of the Southwest Petroleum case by saying that the court adheres to the rule there announced that a lot owner in Lincoln Terrace could not subject the land to the ordinary right of an oil and gas lease to the extent of drilling an oil and gas well thereon. See, also, Christ's Methodist Church v. Macklanburg, 198 Okl. 297, 177 P. 2d 1008; Arlt v. King, 328 Mich. 645, 44 N. W. 2d 195; Redfern Lawns Civic Assn. v. Currie Pontiac Co., 328 Mich. 463, 44 N. W. 2d 8; West Bloomfield Co. v. Haddock, 326 Mich. 601, 40 N. W. 2d 738; Mattson v. Fezler, 202 Okl. 589, 216 P. 2d 275; Hogue v. Dreeszen, 161 Neb. 268, 73 N. W. 2d 159; Dundee Realty Co. v. Nichols, 113

Neb. 389, 203 N. W. 558; 26 C. J. S., Deeds, § 164 (3), p. 1114; Annotation, 175 A. L. R. 1191.

Cooke v. Kinkead, 179 Okl. 147, 64 P. 2d 682, is characterized by appellants as a case directly in point with the one now under consideration. The language of the opinion in the Kinkead case demonstrates that the appraisal of it as decisive of the case presently being considered is unjustified. This language of the Kinkead case sets it apart from this case: "The language is clear and specific to the effect that no building shall ever be used or occupied for any purpose except that of residence exclusively. There can be no doubt as to the meaning of such language. In order to sustain plaintiff's contention in this case we would be compelled to distort the well-established meaning of words of common usage, and to extend such meaning by implication to situations unexpressed in the instrument. If there was an intention on the part of the dedicators to restrict the use of the land itself, such intention is unexpressed, and is unavailing in this case. Moore v. Stevens, supra. In so far as the land itself is concerned, there are no express words limiting its use, and to that extent the defendants who are landowners in the addition hold the same in fee-simple title, subject only to the restrictions on the use of buildings erected thereon." The court that decided the Kinkead case distinguished it in Southwest Petroleum Co. v. Logan, *supra,* by this language: "The case of Cooke v. Kinkead, supra, denying an injunction to prevent drilling in Howe's Capitol addition to Oklahoma City, is distinguishable from the instant case in that the restrictions there were held to apply to the use of buildings on the premises and not to the use of the land itself. In the case before us, the restrictions clearly apply to the use of the land." In this case the language of the restriction that "All of the lots in said Addition shall be exclusively a residential area" applies to the use of the land. In this situation the Kinkead case cannot influence the decision of this case.

The premises involved were, at the time of the execution of the instrument evidencing the restrictive covenants, owned in this manner: Appellant owned the mineral estate and the legal title to the part of the surface estate sold by him to Reed on contract which had not been fully performed. Reed owned the surface estate except the legal title to a part of it which was held by appellant as above stated. The appellants argue that the restrictive covenants do not affect the mineral estate of appellant because of a lack of consideration. He owned Block 5 of the addition when he executed the instrument containing the restrictions. It was not burdened by them but it was obviously benefited thereby. Appellant was assured by them that the addition would be an exclusive restricted residential area consisting of newly built houses according to a plan for its permanent improvement; that no undesirable improvement could be made therein; and that no objectionable activity could be conducted thereon. Block 5 would enjoy this advantage and benefit without the burden imposed on the property within the terms of the restrictions.

The unpaid part of the indebtedness of Reed on his contract of purchase of March 27, 1953, probably in excess of $12,000, was secured to appellant only by the legal title to the real estate described in the contract. The real estate was then unimproved. Reed could not accomplish his house-building project on it without financing and he could get it only if the use of the real estate was restricted to residential purposes. This was accomplished by appellant becoming a party to the restrictions and thereby the value of the security he had for the indebtedness owing him was very materially increased because of the improvements made.

The restrictions were in these respects a two-fold advantage and benefit to appellant. They were also a detriment to him if they operate, as the trial court found, to limit the means of access to the restricted premises he had to recover and enjoy any oil and gas in and

under the land. If what was done conferred a benefit on appellant or was a detriment to him, it was a consideration for the transaction. A consideration sufficient to support a promise may be a detriment to the promisee as well as a benefit accruing to the promisor. United States Fidelity & Guaranty Co. v. Curry, 126 Neb. 705, 254 N. W. 430; Crawford State Bank v. McEwen, 132 Neb. 399, 272 N. W. 226; Fluckey v. Anderson, 132 Neb. 664, 273 N. W. 41; Phelps v. Blome, 150 Neb. 547, 35 N. W. 2d 93.

The instrument expressing the restrictions contains reciprocal and mutual covenants. Appellant thereby bound himself not to violate the covenants and if he did, anyone interested in the real estate was authorized to enforce them or sue for damages at his election. Reed made the same promise and for any violation exposed himself to proceedings to enforce the covenants or to be subjected to a suit for damages. A like promise proceeded from appellant and Reed to subsequent purchasers and from them to appellant and Reed. These are mutual and reciprocal promises and rights.

The court said in Erichsen v. Tapert, 172 Mich. 457, 138 N. W. 330: "The mutual agreements of the signers to conform to the restrictions was sufficient consideration to support the contract." See, also, 12 Am. Jur., Contracts, § 113, p. 606; Restatement, Contracts, §§ 75-76, pp. 80-86. The execution and delivery of the restrictive covenants were not without legal and sufficient consideration.

The prohibitory efficacy of the restrictions as to appellants is contested by their assertion that the instrument containing them does not literally eliminate the drilling of test wells for oil and gas and was not intended to do so. The words oil and gas are not written in the instrument containing the restrictions. It is significant that paragraph 2 of the instrument which contains the words "All of the lots in said Addition shall be exclusively a residential area" is not mentioned by appellants.

They refer to and set out in full paragraph 3 which describes the buildings that may be erected and paragraph 6 which forbids any activity which may cause an annoyance or nuisance or which may be offensive or objectionable as the parts of the instrument pertinent to the discussion of this contention. They disregard the highly important and all-inclusive declaration that the lots shall be exclusively a residential area. It may not be concluded that the drilling of a well or wells for oil and gas is a use of the lots for residential purposes or that a limitation on the use of the real estate like that contained in the restriction in this case does not exclude every use of the premises not pertaining to residence purposes.

In Southwest Petroleum Co. v. Logan, *supra,* the court said: "Under the natural and common sense meaning of the term 'residences' we cannot say that the drilling of wells for oil and gas is a use of property for residence purposes. It does not matter that the parties did not anticipate the oil development in this area and contemplate the necessity of excluding the drilling of oil wells in the addition when it is clear that they intended to exclude every use not pertaining to residence purposes."

West Nichols Hills Presbyterian Church v. Folks, *supra,* employs this language: "The use of the land for 'residence purposes only' means that the lots shall be used for residences and for no other purpose, * * * but failing to specifically forbid parking for those attending a nearby church, does not nullify or in any way effect (affect) the clearly expressed intention of the dedicator that the lots involved here shall be used for residence purposes only."

Carr v. Trivett, *supra,* concluded: "The restrictive clause here under consideration (for 'residential purposes') is clear and unambiguous and cannot be reasonably construed otherwise than as a prohibition against the use of the property for any purposes other than for residential purposes."

In Moore v. Stevens, *supra,* the restriction upon which injunctive relief was based provided that the property could be used for residence purposes only. The court said in reference thereto: "The covenants here under consideration relate to the *use to* be made of the property rather than to the character of the building to be erected upon it." See, also, Annotation, 155 A. L. R. 528.

The argument is made that the restrictions concerned herein must fail because of lack of privity of estate. The factual basis for this, as stated by appellants, is that Reed had no interest in the mineral estate and at the time the restrictions became effective appellant had only the legal title as security for an indebtedness to a part of the surface estate which is considered personal property. Buford v. Dahlke, 158 Neb. 39, 62 N. W. 2d 252. Appellants concede, with some undefined reservation, that there is "perhaps privity of estate between Reed and Rieseberg" as to the surface estate but they assert this does not authorize interfering with the mineral estate. The present case permits escape from what has been characterized the utter confusion of judicial decisions involving the problem of whether a covenant is real so as to run with the land or merely collateral or personal.

The discussion in Southwest Petroleum Co. v. Logan, *supra,* is pertinent to the hypothesis of appellants: "It has long been an established principle that an agreement restricting the use of land in a certain tract, imposed thereon by a common grantor under a general improvement plan, intended for the mutual benefit of all grantees therein, may be enforced in equity by any subsequent grantee in such tract, who purchased with reliance on the general plan, against any other subsequent grantee taking with notice of the restrictions. * * * The restrictions need not rise to the dignity of a grant or reservation, but create an equitable right in the nature of an easement, enforceable in equity against all persons taking with notice, even if it rests on no broader

principle than that equity will enforce a proper contract concerning land, against all persons taking with notice of it."

In Johnson v. Robertson, 156 Iowa 64, 135 N. W. 585, Ann. Cas. 1915B 137, it is declared: "From these decisions it will be observed that these building restrictions or agreements, particularly where negative in character, create equitable easements, amenities, or servitudes, and that they may be enforced by any one interested in the property without regard to privity either of contract or estate and no matter whether the covenant may be said to run with the land or not."

Friesen v. City of Glendale, 209 Cal. 524, 288 P. 1080, contains this language: "A restriction imposed by subdividers of a tract of land contained in all deeds conveying lots therein that the premises shall be used for residence purposes only, which restriction was to inure to the benefit of each of the lots in the tract and was accepted by the grantees of said lots, is in the nature of a negative easement or equitable servitude and not a positive easement of right in the land itself * * *. It is merely a right enforceable in equity as between the parties to the contract, or their successors with notice, on the theory that it would be unconscionable to permit one who had contracted to use his property in a particular way to violate his agreement."

The Wisconsin court said in Boyden v. Roberts, 131 Wis. 659, 111 N. W. 701: "The whole tract of land being by the Johnston-Weiss agreement impressed with an equitable servitude for the benefit of all purchasers under the scheme that the property should be preserved for first-class residence property, and other uses named prohibited, each grantee is entitled to enforce such restriction in equity. 2 Pom. Eq. Jur. (3d ed.) § 689; 1 Jones, Real Prop. in Conv. § 780. Where the general plan or scheme of an agreement restricts property to a certain use and prohibits other uses, it is immaterial whether the covenant runs with the land or not, where

the agreement is made for the mutual benefit of all the land though held by different owners. In such case equity will enforce such servitude as between the several grantees of parts of the premises with notice." See, also, 7 Thompson on Real Property (Perm. Ed.), § 3614, p. 102; II American Law of Property, § 9.26, p. 409; 26 C. J. S., Deeds, § 167 (2), p. 1143; 14 Am. Jur., Covenants, Conditions and Restrictions, § 193, p. 608.

Appellants are barred from trespassing on the part of Sunny View Heights Addition to Kimball, Nebraska, which is subject to and affected by restrictive covenants, and from going upon the premises which are within the reach of the provisions of the instrument containing the restrictions involved herein for the purpose of exploring for and producing oil and gas or for any other purpose inconsistent with the terms of the instrument. Appellant desired that Sunny View Heights Addition be constituted and developed as a restricted area for residential purposes only. He was pleased to have an instrument to accomplish this executed and made effective as to all who had or acquired any part of the addition. He realized this by joining appellees in the execution of the instrument on August 27, 1953. Appellees, because of this instrument, expended between that date and May 27, 1954, about $10,000 for a sewage system and for sidewalks. They also invested more than $50,000 in development of the property, about three-fourths of which was after August 27, 1953. The restrictions made it possible for appellees to finance the housing project and this in turn induced the large investment which they made of their individual resources. The insurance company, after the execution and recording of the instrument reciting the restrictions, loaned more than $200,-000 on residence properties in the addition. The individual interveners purchased houses therein because of the restricted nature of the area. Any rights acquired by Lowell J. Williamson in the addition are subject to the restrictions. He claims through appellant.

May v. City of Kearney, 145 Neb. 475, 17 N. W. 2d 448, repeats the language of 10 R. C. L., § 19, p. 689, as follows: "Equitable estoppels operate as effectually as technical estoppels. They cannot in the nature of things be subjected to fixed and settled rules of universal application, like legal estoppels, nor hampered by the narrow confines of a technical formula. * * * The following, however, may be ventured as the sum of all cases: That a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has, in good faith, relied thereon. Such an estoppel is founded on morality and justice, and especially concerns conscience and equity." See, also, 31 C. J. S., Estoppel, § 59, p. 236.

Ricketts v. Scothorn, 57 Neb. 51, 77 N. W. 365, 73 Am. S. R. 491, 42 L. R. A. 794, adopts this language from 2 Pomeroy, Equity Jurisprudence, p. 804: "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, or contract, or of remedy, as against another person who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, of contract, or of remedy." See, also, Cotner College v. Estate of Hester, 155 Neb. 279, 51 N. W. 2d 612. Appellants may not escape the effect of the instrument to which one of them was a party and which has produced the result of which they now complain. Polyzois v. Resnick, 123 Neb. 663, 243 N. W. 864.

The many changes in the Kimball area and community resulting from the production of oil and gas and the incidences thereof are detailed in an effort to show that the purposes of restrictions imposed on the addition have been to such an extent defeated that the prohibitions sought as to appellants are meaningless and

futile. A reference to language in Southwest Petroleum Co. v. Logan, *supra,* is an appropriate refutation of this: "The law regarding change of condition of the surrounding neighborhood as a defense to such actions appears fairly well settled, but each case must be decided on the equities of each particular situation as it is presented. The test ordinarily is whether the original purpose and intention of the parties creating the restrictions pursuant to the general scheme has been so destroyed by the changed conditions, without fault on the part of those who seek to be relieved, that the restrictions are no longer of substantial benefit to the residents, and the original purpose cannot be reasonably effected by the granting of an injunction. * * * From our examination of the entire record we conclude that the addition still has substantial value to the lot owners for residential purposes. Under these circumstances, although the property is undoubtedly valuable for oil and gas purposes, this will not relieve the defendants from the restrictions, for we cannot say that the original purpose of preserving to the home owners in the addition a purely residential district cannot be accomplished by granting the injunctions. * * * We cannot accede to defendants' argument that the original purpose to create an exclusive high class residence. district has been destroyed because it will no longer be high class or exclusive. The question is not whether suitable persons will in the future purchase property in the addition, but whether the restrictions still preserve to the addition its character of a residence district."

The Michigan court said in Bohm v. Silberstein, 220 Mich. 278, 189 N. W. 899: "Where the restrictions in a residential subdivision consisting of 18 blocks have been substantially complied with, the fact that adjoining or surrounding property is used for business purposes does. not so change the character of the subdivision itself that the owners of property therein may not have the restrictions enforced."

Appellants contest injunction as an appropriate remedy in this case. They say the harm therefrom to them is very much greater than the benefit to those in whose favor it has been granted because, they affirm, the effect of it is a confiscation of the mineral estate of appellant. These arguments may not be accepted. Appellant's mineral estate has not been confiscated. He may drill for oil on Block 5 of the addition and produce all the oil and gas thereby discovered. There is no claim in this case that the restrictions apply in any way to Block 5. Appellants may adopt, if they desire, directional drilling from that location. Appellant owns and may continue to own the mineral estate as far as any effect this case has on it. Injunction is in this class of cases an appropriate if not the only adequate remedy. This has been declared by this court in Dundee Realty Co. v. Nichols, *supra*: "A remedy at law would be inadequate, and would lead to a multiplicity of actions, and the subversion of this ideal scheme of improvement and development would still remain. This dwelling, as located, is a clear and direct violation of the letter as well as the spirit of the restrictive covenant, and is an irreparable injury to each of plaintiffs, and to each lot owner in the addition, thus creating a condition which is appealing to a court of equity, in the exercise of its extraordinary power. The relief sought by plaintiffs is fair, equitable, and just." See, also, Hogue v. Dreeszen, *supra*.

The restrictive covenants involved herein by their terms terminate June 1, 1993. The judgment granted an injunction of unlimited duration, enjoining appellants and their successors from trespassing on the premises involved and from drilling oil and gas wells thereon. The judgment is incorrect in the respect that the injunction was not limited to the period of the existence of the restrictions. The judgment should be and it is modified to provide that the injunction granted be and is limited to the period ending June 1, 1993.

The judgment should be and it is affirmed as modified.

AFFIRMED AS MODIFIED.

CHAPPELL, J., participating on briefs.