ROBERT B. PLUMB AND ELEANOR M. PLUMB, APPELLEES, V. PHILLIP G. RUFFIN, DOING BUSINESS AS TOWN AND COUNTRY MARKET, APPELLANT.

328 N.W.2d 792

Filed January 14, 1983. No. 81-756.

Joseph Polack of Polack & Woolley, P.C., for appellant.

Harry B. Otis of Gaines, Otis, Haggart, Mullen & Carta, for appellees.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

HASTINGS, J.

The defendant, Phillip G. Ruffin, doing business as Town and Country Market, has appealed from an order of the District Court which enjoined him from constructing a convenience store on his property. Certain protective covenants affecting such property prohibited commercial developments. He assigns as error, first, that the plaintiffs themselves are also in violation of the protective covenants and therefore have no standing in equity to bring this action, and, second, that the property has become commercial in nature notwithstanding the protective covenants.

The plaintiffs, Robert B. and Eleanor M. Plumb, are the owners of Lot 5, Block 6, Rockbrook Heights, an Addition to the City of Omaha, which lot is located at the southeast corner of 108th and Oak Streets. They have been owners of this property since 1959. At that time, they built and have maintained on that property a four-plex living unit which also contains an additional fifth apartment in the basement for the caretaker. The defendant acquired title to Lots 1, 2, 4, and 5, Block 5, Rockbrook Heights, by deed dated November 7, 1980. These

four lots lay directly north of and across Oak Street from the plaintiffs' property. Construction of a convenience-type store and service station, which it is proposed will operate 24 hours per day, was commenced by the defendant. That gave rise to this litigation.

In July of 1955 certain protective covenants affecting Rockbrook Heights Addition were drafted and later filed in the office of the Douglas County register of deeds. As to Lot 5, Block 6, and Lots 1, 2, 4, and 5, Block 5, these properties may be used for schools and playgrounds, single-family dwellings, and three-family or four-family dwellings, "but said lots shall be used or occupied for no other purpose." Lot 3, Block 5, is located immediately north of the defendant's property. It consists of the remainder of Block 5, and is equivalent in size to 10 normal-sized lots. According to the protective covenants it may be used for certain commercial purposes, including retail stores and filling stations.

These various covenants are to run with the land and shall be binding for a period of 25 years, "at the expiration of which time they shall be automatically extended for successive periods of ten (10) years unless they are changed . . . by written agreement among the then owners of a majority of the said lots . . . ." The covenants also specifically authorize any person owning land in the subdivision to bring an action in equity to prevent anyone from attempting to violate any of their provisions.

There also appears of record a partial release and amendment to the protective covenants, the effect of which is to permit commercial use of Lots 1, 2, 4, and 5, Block 5, the defendant's property. Although this instrument is dated August 2, 1955, it was not filed of record until September 12, 1960, some 16 months after the plaintiffs had acquired title to their property.

In an effort to accommodate the plaintiffs, the defendant had proposed to alter his plans so as to place

the improvement mostly on Lots 2 and 4 and leave a portion of Lots 1 and 5, located immediately north of the plaintiffs' property, as a buffer area.

The defendant attempted to show that the neighborhood surrounding the lots in question had changed to such an extent that the original purpose and intention of the parties in creating the restrictions could no longer be accomplished. This consisted of testimony that Lot 3 of Block 5 contained commercial establishments, as did Rockbrook Village Plaza located immediately west and north of the defendant's lots. However, the remaining portions of Rockbrook Heights remain as residential property. There is no evidence in the record that the areas being used as commercial areas are being utilized other than in accordance with the original restrictions made at the commencement of this development.

The defendant's contention that the plaintiffs, by a technical violation of the covenants themselves in permitting a fifth living unit in the basement for a caretaker, have somehow waived enforcement of the covenants against the defendant is answered by *Pool v. Denbeck,* 196 Neb. 27, 241 N.W.2d 503 (1976). In that case this court said: " 'As a rule, nonobjection to trivial breaches of a restrictive covenant does not result in loss of the right to enforce the covenant by injunction, and acquiescence in violations * * * which are immaterial and do not affect or injure one will not preclude him from restraining violations thereof which would so operate as to cause him to be damaged. . . .'

" ' "Plaintiffs are not estopped from preventing a most flagrant violation of the restrictions on account of their theretofore failure to stop a slight deviation from the strict letter of such restrictions." ' " *Id.* at 34, 241 N.W.2d at 507-08.

The defendant cites *Reed v. Williamson,* 164 Neb. 99, 82 N.W.2d 18 (1957), in support of his proposition that where the character of a neighborhood has so changed that the restriction is of no value to the land

intended to be benefited, an injunction will not lie. However, quoted with approval in *Reed* is the following language from *Southwest Petroleum Co. v. Logan,* 180 Okla. 477, 71 P.2d 759 (1937): " 'The test ordinarily is whether the original purpose and intention of the parties creating the restrictions pursuant to the general scheme has been so destroyed by the changed conditions, without fault on the part of those who seek to be relieved, that the restrictions are no longer of substantial benefit to the residents, and the original purpose cannot be reasonably effected by the granting of an injunction. * * * From our examination of the entire record we conclude that the addition still has substantial value to the lot owners for residential purposes. . . . The question is not whether suitable persons will in the future purchase property in the addition, but whether the restrictions still preserve to the addition its character of a residence district.' " *Id.* at 118, 82 N.W.2d at 28-29.

As pointed out earlier in this opinion, there have been no changed conditions; the area has developed as was intended by the original developers of the subdivision, and that part intended to be commercial remains commercial, and that portion designated as residential stays as such.

Again, quoting from *Reed:* " 'It has long been an established principle that an agreement restricting the use of land in a certain tract, imposed thereon by a common grantor under a general improvement plan, intended for the mutual benefit of all grantees therein, may be enforced in equity by any subsequent grantee in such tract, who purchased with reliance on the general plan, against any other subsequent grantee taking with notice of the restrictions.' " *Id.* at 114, 82 N.W.2d at 27.

The defendant also argues that the plaintiffs have failed to adduce any evidence of damages, other than the fact that their bedroom windows will overlook a 24-hour commercial operation. However, as

stated in *Wessel v. Hillsdale Estates, Inc.,* 200 Neb. 792, 799, 266 N.W.2d 62, 67 (1978): " 'Ordinarily, in a suit brought for that purpose, the plaintiff is entitled to an injunction without a showing of actual damages or that irreparable injury will result from a continued violation of the restrictive clause.' "

From a de novo review of the record, we conclude that the judgment of the District Court was correct and is affirmed.

AFFIRMED.

CLINTON, J., not participating.