504

## CIRCUIT COURT OF FAIRFAX COUNTY

London Towne Homeowners Ass'n

v.

Mary Rose Greene et al.

Case No. (Chancery) 111060

London Towne Homeowners Ass'n

v.

Robert K. Thompson et al.

Case No. (Chancery) 110259

London Towne Homeowners Ass'n

v.

David M. McGaha et al.

Case No. (Chancery) 111059

BY JUDGE THOMAS S. KENNY

January 24, 1990

Mr. Thompson has moved for leave to allow Dennis Burke to testify concerning statements made by a Mr. Eibell while Eibell was the president of Gateway Development Corporation, the developer of London Towne. Apparently, Mr. Eibell was also an officer of London Towne Homeowners Association at the time of the statements.

The statements to be related concern Mr. Eibell's plans for some or all of the parcels which are the subject matter of this suit, and Mr. Thompson proffers that the statements will indicate an intention by Mr. Eibell that the land should be available for development, a position contrary to the Homeowners Association's position in this suit. Mr. Thompson contends that the Homeowners Association should be bound by Mr. Eibell's statements, since Eibell was an officer of the Association at the time they were made. He cites the rule discussed by Professor Friend to the effect that "[s]tatements made by persons holding or claiming an interest in property may be admissible against persons claiming under them." Friend, *The Law of Evidence in Virginia*, 669 (3rd ed. 1988).

Mr. Thompson's reliance on this rule is misplaced. Mr. Eibell is not a predecessor in interest to the Association; he was an *agent* of the Association. Actually, his more salient role for these purposes is as agent for a predecessor in interest to Mr. Thompson. As such, his statements favorable to Mr. Thompson's position would be inadmissible, since "[p]redecessor's statements are not admissible in the successor's own behalf." *Id.* at 670.

If Mr. Eibell was speaking as an agent of the Association within the scope of his employment as such, the statements would probably be admissible. *Id.* at 67 (3rd Ed. Supp. 1989). However, it is apparent from the proffer that Eibell was speaking more as an agent of Gateway when he made the statement; in other words, he was "wearing his developer's hat." As such, he spoke as a predecessor to Mr. Thompson, and the hearsay rule requires Mr. Burke's recital of his statements to be excluded.

March 28, 1990

These cases, consolidated for trial, initially sought a wide range of relief concerning certain undeveloped parcels of land in the London

Towne subdivision. The parcels in question are Parcel A, Section 1; Parcel P, Section 5; and Parcel R, Section 5. They will be referred to in this opinion as Parcels A, P and R, respectively. By earlier rulings of the court, the issues were substantially narrowed to those set forth in the pre-trial order following the hearing of January 4, 1990, namely:

a. Whether Parcels A, P and R are encumbered by negative reciprocal easements which would restrict the parcels to their current use;

b. Whether Parcels A, P and R are encumbered by express easements for ingress, egress and parking in favor of the members of London Towne Homeowners Association;

c. Whether the restrictive covenants of London Towne apply to the said parcels;

d. Whether the vacation of a plat showing other open space, without plaintiff's objection or consent, and the subsequent replatting and development of such area, estop plaintiff in this case; and

e. Whether a prohibition on development of these parcels would violate the Equal Protection Clause of the federal constitution.

After hearing the evidence *ore tenus* and reviewing the exhibits in this case, I make the following findings of fact.

1. London Towne is a subdivision within Fairfax County containing 665 residential townhouse lots, numerous parcels of open space, and public and private streets on 94.3875 acres.[1] (Reference: Ex. C-29I.)

2. London Towne was developed in sections over a period of years by several developers. Sections 1, 2 and 3 were developed by Keystone Development Corp. during the period 1965–1967. Keystone encountered financial difficulties in late 1967, and its properties were foreclosed on. (References: Exs. C-4; C-6; C-8; G-19, p. 6.)

3. Gateway Development Corporation took over the development of London Towne in December, 1967. In October, 1968, it vacated and replatted Section 1, in the process creating Parcel A (one of the parcels in dispute here). It also platted Sections 4 (in August, 1968)

---

[1] This data was taken from the plat notes of the last portion of the subdivision to be developed, Parcel S, Section 5 (Exhibit C-29I). It should be noted that the next-to-last plat (Exhibit C-29H), prepared some seven-and-a-half years earlier, showed a total area in the subdivision of 99.271 acres. No explanation was offered for the difference in acreage totals between the two plats.

and 5 (in May, 1969). The plat for Section 5 included 5 parcels of open space (Parcels P, Q, R, T and U), totaling 7.8439 acres, which (according to the deed of dedication and the plat notes) were to be conveyed to plaintiff London Towne Homeowners Association. (References: Exs. G-19, p. 6; C-5; C-10; C-12; C-28.)

4. By deed dated September, 1970, but not recorded until August, 1971, Gateway vacated a portion of Section 5. The Board of Supervisors of Fairfax County adopted an ordinance approving the vacation on April 16, 1973. The portion thus vacated consisted of 7.534 acres out of the original 22.348 acres in Section 5. This vacated portion, plus an additional six acres of adjacent land, were resubdivided into Sections 6A, 6B, 6C and 7 by Gateway. (*See* Finding No. 8.) Of the 7.534 acres vacated, 3.246 acres represented open space parcels (T, U and a portion of P) that were supposed to be conveyed to the Association but had not been so conveyed at the time of the vacation. (References: Exs. C-21; G-11; C-14; C-15; C-16; C-18; C-28; C-12.)

5. Plaintiff Association did not join in the deed of vacation recorded by Gateway in August, 1971. No evidence was presented as to whether it knew of the deed of vacation. No evidence was presented as to whether it knew of the ordinance of vacation adopted by the Board of Supervisors. (Reference: Ex. C-21.)

6. (a) The London Towne community was developed in a consistent style throughout the first five sections of development. This pattern consisted primarily of traditional, brick veneer townhouses arranged in rows surrounding "squares" found in Sections 2, 3, 4 and 5 — Haxton Square, Lambeth Square, Bodley Square, Hatfield Square, Palmerston Square, Maidstone Court, Cardigan Square, Bentley Square, Gatwick Square, and Smethwick Place. (References: C-29A; C-29B; C-29C; view by court.)

(b) Of these ten "squares," eight (all but Gatwick and Smethwick) were conveyed to the Association by the developer, even though the deeds of dedication by which the parcels were created did not require such conveyance. With respect to the remaining two, Gatwick and Smethwick, the deed of dedication for Section 5 required their conveyance to the Association, but such conveyance never occurred. The Association does not own any land in Section 5. (References: Exs. C-7; C-9; C-11; C-12; Frey.)

(c) All ten squares, including Gatwick and Smethwick, appear on their various plats as shaded areas with a reference to the following plat note: "Shaded areas indicate public easements for ingress and egress, sidewalks and parking purposes." The language of the plat note is identical on each plat. (References: Exs. C-29A; C-29B; C-29C; C-28.)

(d) Gatwick Square (i.e., the shaded area on the plat) represents the bulk of Parcel P,[2] owned by defendant McGaha. The remainder of Parcel P is made up of small strips or wedges of land between the rows of townhouses fronting on the square. (References: Exs. C-29D; G-38.)

(e) Smethwick Place (i.e., the shaded area on the plat) represents the bulk of Parcel R, owned by defendant Greene. The remainder of Parcel R is made up of small strips or wedges of land between the rows of townhouses fronting on the square. (References: Exs. C-29D; G-38.)

(f) Each of the ten squares is bordered on three sides by rows of townhouses facing the square; the fourth side of each square fronts on a public street. Around the portion of each square's perimeter bordered by townhouses runs an access road (not a public street), with parking spaces, and a sidewalk running parallel to the access road between the road and the townhouses. The access roads, parking areas and sidewalks are all on the parcels known as "squares." The roads and sidewalks provide the only means of access between the townhouses and the public street, and the only parking available for the townhouses is in the parking areas on the squares. (References: Exs. C-32A; C-32C; Mori.)

(g) The central areas of the squares (that is, the portion of each square enclosed by the access road) varies in appearance from square to square, ranging from heavily wooded natural area to a more manicured park-like setting. However, all such areas are used as open space available for fairly passive recreational activities — the most "active" recreational use observed was the installation of some basic playground equipment, and the most common installation was a park bench and perhaps a picnic table. On Parcel P (Gatwick Square), the central area is grassy and parklike, with scattered trees

---

[2] That is, Parcel P as presently constituted, after the partial vacation of Section 5 described in Finding No. 4, *supra.*

and park benches. On Parcel R (Smethwick), the central area is heavily wooded and natural; a see-saw and other playground equipment in the middle is reached by unpaved paths through the woods. (References: view by court; Atkins; Exs. C-32A; C-32C.)

7. (a) There is no "square" in Section 1. Section 1 consists of a row of ten townhouse lots and Parcel A. Parcel A is bounded on its northern side by the ten lots, and along that side there is a sidewalk, access road with parking areas, and a "turnaround" (cul-de-sac) area. As with the squares, the sidewalk and access road provide access to the townhouses. Instead of being surrounded by townhouses, however, Parcel A is fronted on its eastern side by Paddington Lane, a public street that serves as the main entrance road to the community; on its southern side by a service road parallel to and serving Lee Highway (U.S. Route 29); and on its western side by an open space parcel owned by the Association. (References: Exs. C-1; C-27.)

(b) Unlike the "squares" described in Finding 6, Parcel A is *not* completely shaded on its plat. The only shaded portion is the area covered by the sidewalk, road and turnaround, which appear to cover about half the parcel. The plat note reads "52' easement for public sidewalk, parking, ingress and egress." The plat on which this language appears was recorded in October, 1968, *after* the plats for Sections 2, 3 and 4 were recorded. (References: Ex. C-27.)

(c) There are open space areas elsewhere in the community which are bounded on only one side by townhouses, for example, Ealing Court (Parcel Q, Section 5); the portion of Parcel J, Section 4, that is opposite Maidstone Court. However, each of those parcels appears entirely shaded on its respective plat and is subject to the limiting plat note described in Finding 6(c). (References: Exs. C-28; C-29C.)

(d) On the other hand, there are also substantial areas of open space in the subdivision which are not shaded on their plats. As far as the Court can determine, in every such case (except Parcel A), the property has in fact been conveyed to the Association by the developer. The unshaded portion of Parcel A appears to be unique in the entire subdivision in being the only substantial amount of unshaded open space which has not been conveyed to the Association. (References: Exs. C-7; C-9; C-11; C-17; C-19; C-20.)

(e) No evidence was introduced at trial of an intention by the developer to convey Parcel A to the Association as common area.

Indeed, there was testimony that the president of Gateway affirmatively refused to do so.[3] (Burke.)

(f) The unshaded portion of Parcel A has consistently been *used* by the Association as common area. It has maintained the area, used it for a playground/tot lot, and kept its "entrance feature" (a tall brick, gate-like structure surrounded by landscaping, with the words "London Towne" emblazoned on the structure) on the parcel.[4] (Reference: Atkins.)

(g) The official of Fairfax County responsible for approving the development plans for London Towne expected that Parcel A, Section 1, would be conveyed to the Association as common area. No action was taken by him, however, to ensure that such a conveyance in fact occurred. (Reference: Chilton.)

(h) The plaintiff Association does not own any land in Section 1. (References: Exs. T-4; T-5; T-6; T-7; T-12; T-13; T-20; G-1.)

8. (a) The pattern of development described above changed in Sections 6A, 6B, 6C and 7, which were also developed by Gateway. These sections are in the northeast corner of the London Towne subdivision and constitute about 13.6 acres out of the entire 94.4 acres in the community. Instead of being arranged around squares of open space, the townhouses in these sections are arranged in a much denser, linear pattern along both sides of the streets in that area. The only open space which is not devoted to streets or parking is the occasional strip or wedge between rows of townhouses. In addition, the style of home built in those sections is quite different from the earlier sections — the later homes are contemporary, smaller, and appear to be of less substantial construction quality than the older ones. (References: C-1, C-14; C-15; C-16; C-18; C-29E; C-29F; C-29G; C-29H; view by court.)

(b) The density of development in these sections was litigated by the Association as an intervenor in the case of *Gateway Develop-*

---

[3] The president of Gateway also affirmatively refused to convey Parcels P and R. Unlike Parcel A, however, Parcels P and R were specifically promised to the Association in the deed of dedication for Section 5.

[4] No evidence was offered as to who installed the "entrance feature" on Parcel A, or the complementary structure on the companion parcel across Paddington Lane which *is* owned by the Association. Obviously, if the Association did so, it would not mean much, but if the developer had done so, it could have had significance in evidencing his intent to make Parcel A common area.

*ment Corporation v. The Urban County Board of Supervisors of Fairfax County*, At Law No. 29502 in the Circuit Court of Fairfax County. In that case, Judge Thornton ruled on September 4, 1973, that Gateway was not bound by representations of planned density made by counsel at the time of zoning but rather would be allowed to develop the property to the maximum density allowable under the zoning category applicable to the property. (Reference: Ex. G-56.)

9. (a) A further departure from the earlier pattern of development occurred when Parcel S, Section 5, was developed into the houses surrounding Hancock Court, in September, 1980. Parcel S was a 4.8649 acre parcel of open space on which a community swimming pool had been constructed. The parcel was never intended to be owned by the Association but was owned by an entity known as London Towne Recreation, Inc. The swimming pool cracked open and became useless during its first year of operation, and the mortgage company foreclosed the deed of trust on the property in 1976. (References: Exs. C-28; C-12; M-53; Burke.)

(b) The foreclosed property was sold to Springfield Square Associates in December, 1978, and ultimately acquired by Pulte Home Corporation around 1980. (References: M-54; C-29I.)

(c) Pulte resubdivided the 4.8 acre property into 35 lots and about 3.5 acres of open space. Instead of using the "square" arrangement of the earlier sections, Pulte arranged 3 rows of townhouses in a triangle around a parking lot (which contained a small island of open space), and two more rows of townhouses fronting directly on parking area. (Reference: C-29I.)

(d) The open space resulting from the resubdivision of Parcel S was conveyed to the Association by Pulte, but the Association did not join in the deed of conveyance. There is no evidence that the Association approved or disapproved of the resubdivision or that it even knew about it. (Reference: C-20.)

10. (a) With the exceptions noted in sub-paragraph (b) of this finding, the entire community of London Towne is subject to the same set of protective covenants, initially set out as a "Declaration of Covenants and Conditions" with respect to Section 2, recorded among the land records of Fairfax County in Deed Book 2788, at page 487 (hereinafter "the Covenants"). The Covenants were incorporated by reference in a deed of dedication for each subsequent section of London Towne (Sections 3, 4, 5, 6A, 6B, 6C, and 7),

thereby subjecting each such tract of land to the Covenants. (References: Exs. C-3; C-8; C-10; C-12; C-14; C-15; C-16; C-19.)

(b) The Covenants were not applied to Section 1 by a deed of dedication; rather, the Covenants were applied to individual lots by incorporating them by reference in the conveyancing deeds from Gateway Development Corp. to the initial purchasers of each lot. Copies of these initial conveyancing deeds for six of the ten lots in Section 1 were introduced into evidence — four of the deeds incorporated the Covenants, and two did not. The two that did not — for Lots 6A and 7A, respectively — were the first and the fifth deeds recorded among the six submitted into-evidence, having been dated October, 1968, and July, 1974, respectively. No evidence was adduced to explain why these lots were not subjected to the Covenants. Uncontradicted testimony was adduced at trial that the remaining lots in the section were all subjected to the Covenants and that Parcel A has never been subjected to the Covenants. Thus, the only real estate in the entire subdivision which is not subject to the Covenants is Lot 6A, Lot 7A and Parcel A, Section 1. (References: Exs. T-4; T-5; T-6; T-7; T-12; T-13; Hipp.)

(c) The Covenants provide for the organization of plaintiff Association, of which each lot owner is automatically and necessarily a member; authorize the Association to levy assessments against each lot; grant members of the Association an easement of use and enjoyment in and to the common areas; establish rules for party walls; provide for the exterior maintenance of improvements on the property; impose architectural controls and other use restrictions on the property; and establish enforcement and amendment mechanisms. The Covenants do not establish any rules for the maintenance of common areas or open space in the community, other than the members' easement of use and enjoyment and the members' rights to use the common area for parking, ingress and egress. (References: Ex. C-3.)

(d) The Covenants restrict the use of property within the community to "residential purposes and purposes incidental or accessory thereto, except for model homes and sales offices of Declarant." There is no evidence that any portion of the community has ever been used for non-residential purposes in violation of this restriction. (References: Ex. C-3, Art. X).

11. (a) The zoning rules for the zoning category assigned to the land within the London Towne subdivision at the time the parcels in

question were platted required that no more than 50% of the gross land area in the community be covered by residential building lots, with the remainder being reserved for open space and streets. (References: Chilton; Mori.)

(b) The subdivision plat for each section calculated the percentage of the gross acreage which is taken up by residential lots. At no time were Parcels A, P or R counted as "lots" in these calculations; instead, they were consistently treated as "open space." (References: Exs. C-27; C-28.)

(c) When a portion of Section 5 was vacated, two small parcels previously counted as open space (Parcels T and U), as well as almost two-thirds of the original Parcel P, were included in the area vacated. (See Finding No. 4.). This vacated portion, plus some additional land, was subsequently re-subdivided into a different configuration with denser lot coverage, even though (because of the additional land) the absolute amount of open space increased. (References: Exs. C-29D; C-29E; C-29F; C-29G; C-29H.)

12. None of the defendants here had any *actual* notice of any restriction on development of these parcels. Of the three defendants, only Thompson had physically inspected the property before buying it in. None of the defendants had a title search performed prior to their purchase. (References: Greene, McGaha; K. Thompson.)

Based on the foregoing, I have made the following conclusions of law.

1. Parcels P and R are encumbered by implied negative reciprocal easements which restrict the parcels to their present use as open space.

The doctrine of restrictive covenants in equity, or implied negative reciprocal easements, is that:

> when, on a transfer of land, there is a covenant or even an informal contract or understanding that certain restrictions in the use of land conveyed shall be observed, the restrictions will be enforced by equity, at the suit of the party or parties intended to be benefited thereby, against any subsequent owner of the land except a purchaser for value without notice of the agreement.

*Cheatham v. Taylor*, 148 Va. 26, 37 (1927).

The doctrine requires both the intention that the restrictions should apply and actual or constructive notice thereof on the part of

the person to be charged with the restriction. *Mid-State Equipment Co. v. Bell*, 217 Va. 133 (1976). I find that both prongs of the test are amply satisfied here as to Parcels P and R.

The provision in the deed of dedication for Section 5 that those parcels, among others, would be conveyed to the Association (as each of the other similar "squares" in the community were so conveyed) indicates clearly the intention that Parcels P and R were not to be developed or used as anything other than access, parking and open space. Had Gateway kept its covenanted promise, this issue would never — indeed, could never — have arisen. Furthermore, the obvious design similarities between these squares and the others in the community evidence the intention to preserve them as central areas of open space, the core around which the surrounding homes are centered.

The second requirement for the application of the doctrine is that the defendants must have had actual or constructive notice of the restriction. The purchasers of Parcels P and R did not have actual notice of the covenant provisions referred to above, but such provisions were, at the time of the escheat sale, matters of public record within the chain of title of the property. This is sufficient to create constructive notice to the purchasers. *Fox v. Templeton*, 229 Va. 380 (1985).

Furthermore, the very layout of the community would have alerted the purchasers to the likelihood of a development restriction if either of them had taken the trouble to visit the properties before buying them.

> Even if we disregard the effect of the matters of record to which we have just adverted, a view of the property from the ground would have revealed the uniform residential development surrounding the subject parcel and would have been sufficient to put a purchaser on inquiry as to whether there was a general plan to which the restriction applied.

*Mid-State Equipment Co. v. Bell, supra* at 143.

Does the fact that the overall design scheme of the community changed when Sections 6A, 6B, 6C and 7 were developed defeat the applicability of the doctrine of implied negative reciprocal easements? I think not. The failure to include open space squares in the later sections in no way changes the obvious design scheme (and developer intentions) for those squares in the earlier ones. Looking

at the entire community, every open space square that is surrounded by townhouses was obviously platted and planned to remain as open space. In the latter stages of the community's development, Gateway chose to become niggardly in the provision of open space and to develop its remaining land to the maximum density allowable, a right which Judge Thornton allowed them to exercise over the objections of the plaintiff. Nevertheless, Gateway never made any effort to develop or market Parcels P or R, even though this would have been an obvious opportunity to be seized by a developer who was anxious to squeeze every available bit of density out of his land. Even Gateway must have recognized these open space squares as inviolable.

Thus, both the intent and notice requirements of the implied negative reciprocal easement doctrine are satisfied here. However, defendants Greene and McGaha contend that plaintiff does not have standing to seek the enforcement of these restrictions because it does not own any land in Section 5, even though it does own land in other sections of London Towne. They rely on *Duvall v. Ford Leasing Development Co.*, 220 Va. 36 (1979), as support for this proposition. I do not believe that *Duvall* provides such support. In *Duvall*, a 222-acre tract had been developed over a 27-year period in numerous phases. A small portion of land on Route 1, well removed from the residential units, was sold for commercial purposes. The Supreme Court properly held that the course of conduct of the developer did not indicate an intention on its part to give residents in one section the right to assert an implied restriction on commercial development in another section. That is not the case here, where the parcels in question are located in the heart of the fully developed community of London Towne and are identical in layout and function with a number of other parcels similarly situated which are in fact owned by plaintiff. Since the entire community is knitted together by a single set of Covenants, which expressly permit any owner to enforce their terms, I think the developer's intention to benefit the entire community is manifest. The *Duvall* case is clearly distinguishable on its facts and does not apply.

Defendants also contend that the doctrine of implied negative reciprocal easements does not apply where there are express easements or covenants applicable to the property, citing *Forbes v. Schaefer*, 226 Va. 391 (1983). *Forbes* is not an implied negative reciprocal

easement case; it is a case about the construction of express restrictions and their applicability. But even if more apposite authority were cited, the problem with defendant's position would still be that the same document that imposes the express restrictions in this case (*i.e.*, the deed of dedication to Section 5) also contains the commitment by the developer to deed Parcels P and R to the plaintiff as common area. Defendants cannot have it both ways.

2. Parcel A is encumbered by an implied negative reciprocal easement which restricts the parcel to non-commercial use.

The same doctrine of implied negative reciprocal easements, described above with respect to Parcels P and R, also applies to Parcel A. However, the application of the doctrine differs both in the determination of the developer's intent and in the notice to defendant Thompson.

Unlike Parcels P and R, there was no promise or intention expressed in any document that Gateway would convey Parcel A to the Association. Furthermore, the physical arrangement of Parcel A and its associated townhouses is markedly different from any other square in the community. In short, neither document nor overall design supports the proposition that Parcel A was intended to be restricted to open space.[5] It is apparent, however, that there was an overall design plan for the community that restricted it to single-family residential purposes. Where a common grantor imposes deed restrictions on lots throughout a community and has not imposed them on a parcel he has retained, the restrictions will nevertheless be implicitly imposed on the retained parcel for the benefit of the other restricted parcels. *Mid-Sate Equipment Co. v. Bell, supra; Minner v. Lynchburg*, 204 Va. 180 (1963).

Did defendant Thompson have notice of the restriction? Clearly, he had no actual notice, nor did he have the constructive notice in the form of a recorded deed as did defendants Greene and McGaha. The physical appearance of the community, however, afforded Thompson the same constructive notice that the Supreme Court found present in *Mid-State Equipment Co.*, quoted above in Conclusion 1.

---

[5] See conclusion 3 below for discussion of the express easement over a portion of Parcel A for parking, ingress and egress. The Conclusion discussed here applies only to the "unshaded" portion of Parcel A and does not limit or defeat the express easement.

It is therefore my conclusion that Parcel A is, to the extent it is not expressly encumbered with an access and parking easement, encumbered by an implied negative reciprocal easement limiting its use to non-commercial purposes. To the extent the property is developable at all under the applicable Fairfax County zoning laws, the development is limited to residential use.

3. Parcels A, P and R are each encumbered by express easements for ingress, egress, sidewalks and parking; no further easements of use and enjoyment in favor of the residents of London Towne are expressed or implied.

The recorded plats by which each of the parcels in question was created established express easements for ingress, egress, sidewalks and parking across those portions of the parcels that are shaded on the plats. I do not believe that these easements should be read any more broadly than their clear language requires. Under the circumstances of a particular case, "what may be implied must give way to what is actually expressed." *Duvall v. Ford Leasing Development Corp., supra*, at 42.

I am not speaking here of the implied *negative* easements discussed in Conclusions 1 and 2. Rather, I am referring to the lack of any implied easement giving the residents of London Towne any right to make "affirmative" use of the shaded portions of Parcels A, P and R for anything more than ingress, egress, sidewalks and parking. Neither the Association nor any resident has any right to use the defendants' property for recreational activities, playground space, or even dogwalking. In short, there is no implied easement of use and enjoyment over the defendants' properties. "[N]o use may be made of . . . [an easement], different from that established at the time of its creation, which imposes an additional burden upon the servient estate." *Cushman Corporation v. Barnes*, 204 Va. 245, 253 (1963).

4. The Covenants apply to Parcels P and R and not to Parcel A. Under the Covenants, Parcels P and R are considered "lots," even though there is an implied negative reciprocal easement limiting their use to open space.

As noted in Finding of Fact No. 10, the covenants were made applicable to Section 5 (of which Parcels P and R are part) but not to Parcel A or two other pieces of land in Section 1. I have already discussed, in earlier Conclusions, why I believe certain implied negative reciprocal easements apply to each of these Parcels. In this

Conclusion, I will discuss the effect of the Covenants on Parcels P and R.

Under the Covenants, any parcel owned by the Association for the common use and enjoyment of its members is "common area"; anything else is a "lot." Since Parcels P and R are not owned by the Association, they are lots.

Under the Covenants, this status gives rise to certain benefits and burdens. As the owners of lots, the defendants Greene and McGaha are members of the Association, entitled to vote in Association affairs and to make use of the common area. They are also subject to assessment by the Association under Article VI of the covenants and to the architectural controls, exterior maintenance and use restrictions of Articles VIII, IX and X, respectively, along with any other benefits and burdens of membership found in the Covenants and the Articles of Incorporation and Bylaws of the Association.

One of the use restrictions in Article X is that:

> [n]o portion of the Properties shall be used except for residential purposes and purposes incidental or accessory thereto . . . .

Is it logically inconsistent to hold that there is an implied restriction limiting Parcels P and R to open space when the express restriction just quoted seems to allow residential use? I think not. The express restriction deals with all parts of "the Properties," not just with "lots"; thus, the restriction applies to "common areas" as well as "lots." Obviously, since the principal function of common areas in a planned community is to serve as open space, the drafters of the covenant restriction contemplated that open space was a use that is "incidental or accessory" to a residential use. There is nothing in the express restriction which prevents a "lot" from being limited to open space uses.

5. The Association has not waived its right to assert its claims in this action by failing to object to the vacation and subsequent resubdivision of a portion of Section 5.

"Waiver is the voluntary, intentional abandonment of a known legal right, advantage or privilege." *Fox v. Deese*, 234 Va. 412, 425 (1987). Knowledge of the facts giving rise to a right, and the intent to relinquish the right, are essential elements of waiver. *Employers Comm. Union Ins. Co. v. Great American Ins. Co.*, 214 Va. 410 (1973).

There has been no evidence adduced at trial that the Association had any knowledge of the fact that the vacation of a portion of Section 5 occurred, or when it became aware of it.[6] The burden of proof of establishing waiver is on the one asserting it. *Utica Mutual Ins. Co. v. National Indem. Co.*, 210 Va. 769 (1970). Defendants have failed in this burden.

6. Restricting development on Parcels P and R does not violate the constitutional guarantees of equal protection and due process.

There is no violation of the Equal Protection or Due Process clauses of the Fourteenth Amendment to the United States Constitution,[7] nor of the Due Process Clause of Article I, Section 11, of the Virginia Constitution.[8]

As to the Equal Protection clause, this is so for two reasons: first, parcels P and R are not being treated differently from any other similarly situated open space squares in the community; all those squares surrounded by townhouses are being treated the same.

The second reason there is no constitutional violation here is that no state action is involved. The Equal Protection Clause is a restriction on state governments and operates exclusively upon them. *Shelley v. Kraemer*, 334 U.S. 1, 92 L. Ed. 1161, 68 S. Ct. 836 (1948).

As for Due Process, both Constitutions require notice and an opportunity to be heard before an impartial tribunal before any binding order can be made affecting his right to property. *Commission of Fisheries v. Hampton Roads Oyster Packers & Planters Ass'n*, 109 Va. 625 (1909). *Cf., Parratt v. Taylor*, 451 U.S. 527, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981); *Graham v. Mitchell*, 529 F. Supp. 622 (E.D. Va. 1982). I believe that standard has been met here.

A declaratory judgment in accordance with the conclusions of law stated above is therefore granted.

---

[6] Obviously, it became aware of it sometime prior to intervening in the suit in 1973 to limit the density of development on the replatted portions.

[7] "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[8] "That no person shall be deprived of his life, liberty, or property without due process of law . . . ."

October 4, 1990

This matter is before the court on defendants' motion to dismiss for lack of subject matter jurisdiction. Specifically, defendants cite the failure of the court to obtain personal jurisdiction over the individual owners in London Towne as fatal to continuing subject matter jurisdiction in the declaratory judgment action initiated by the London Towne Homeowners Association ("Association"). Defendants also assert that the tenants and judgment creditors of the owners, the trustees on all deeds of trust in London Towne, the County of Fairfax, title insurance companies, and all holders of utility or other easements over any property in London Towne must be joined. Altogether, the classes of "missing parties" asserted by defendants total several thousand persons.

As an initial matter, it is clear that the Virginia Supreme Court's decision in *Erie Insurance Group v. Hughes*, 240 Va. 165, 393 S.E.2d 210 (1990), is applicable to the proceedings in this suit. *Erie* stands for the proposition that all "adverse parties" are necessary to a declaratory judgment proceeding and articulates three reasons why this is so: first, to avoid subjecting defendants to a multiplicity of suits; second, to conserve judicial resources; and third, to prevent courts from issuing advisory opinions. In other words, if all adverse parties would be precluded (by collateral estoppel) from relitigating issues decided in a prior action, then that prior action comports with the standards set in *Erie*.

Under the doctrine of collateral estoppel, "the parties to the first action *and their privies* are precluded from relitigating [in a subsequent suit] any issue of fact actually litigated and essential to a valid and final personal judgment in the first action." *Norfolk and Western Ry. Co. v. Bailey*, 221 Va. 638, 640 (1980). In the case at bar, our inquiry must necessarily focus on whether the individual homeowners of London Towne are in privity with the Association.[9]

Several cases address the concept of privity in Virginia, but the general test applicable in this case is whether there is such an identi-

---

[9] Of all the categories of "missing parties" suggested by defendants, the fee owners of lots in London Towne appear clearly to have the greatest interest at stake. Accordingly, the analysis here will focus on them. If they are found to be necessary parties, the motion to dismiss must be granted; if they are not necessary parties, then *a fortiori* the remaining classes cited by defendants will not be necessary.

fication in interest of one person with another as to represent the same legal right. *Kesler v. Fentress*, 223 Va. 14, 17 (1982). There are no rigid mechanical inquiries that the court must indulge in to decide if privity exists. Instead, a determination of identity of interest is a factual question that is resolved by a careful examination into the circumstances of each case. *Nero v. Ferris*, 222 Va. 807, 813 (1981).

Counsel have, with their usual thoroughness and competence which I have greatly appreciated throughout this case, briefed the issues around this question extensively. I have carefully considered all of their arguments. My conclusion is that the Association is a representative of its members and lot owners in London Towne (and those claiming through them) for purposes of this proceeding; that it has vigorously and capably represented its own interests and that of its members in this litigation; that the individual owners of lots in London Towne, being in privity with the Association are barred by the doctrine of collateral estoppel from asserting their own claims against defendants in subsequent litigation; and that the present procedural posture of this case is therefore appropriate for declaratory judgment.[10]

An association's status as a representative of the legal rights of its members has found approval in *Frantz v. CBI Fairmac Corp.*, 229 Va. 444, 452 (1985), where the Court noted, "To deprive the association of the right to act on behalf of all unit owners in such matters would have the responsibility for and authority over the common elements fragmented and thus make vindication of the common rights highly uncertain, difficult and burdensome." *Frantz* involved a condominium, not a planned unit development like London Towne. The Association in the present case is a separate corporation which owns property in its own right, and it is thus essentially different from a unit owners association in a condominium, which merely administers the property held by the unit owners as tenants in common. Nevertheless, the approach taken by the Supreme Court in *Frantz* is instructive and, I believe, controlling in determining whether the

---

[10] In addition to avoiding a multiplicity of suits against the defendants, this conclusion also satisfies the other tests of *Erie*: clearly judicial resources are conserved by not having to rehear this exhaustive litigation with several thousand defendants before the court; and the opinion is more than an advisory opinion but is a binding determination of an actual controversy.

members of the London Towne community are bound by the decision in this matter.

The pertinent facts of *Frantz* are as follows:

1. Fairlington Condominium Association filed suit for declaratory judgment and injunction against the condominium developer, Fairmac, alleging a breach of implied restrictive covenants said to exist on property not a part of the condominium project.

2. Individual owners of the condominiums were allowed to intervene on the side of the Association.

3. The Association dismissed its Bill of Complaint because it had negotiated a settlement resolving the extent of restrictions on the disputed property owned by Fairmac.

4. The trial court then dismissed the intervenors, noting that they were bound by the Association's settlement with Fairmac and were therefore estopped from further litigating the existence of restrictive covenants on the disputed parcel.

The Supreme Court affirmed the trial court in its ruling that the intervenors (and by implication, all other members) were bound by the association's settlement. The Court considered, among other things, the effect of § 55–79.53[11] of the Virginia Condominium Act, which is set out in full in the margin. That statute authorizes the unit owners association, "or, in any proper case," a member of the condominium, to sue to enforce the provisions of the condominium instruments.

A similar statutory section appears in the Virginia Property Owners' Association Act, §§ 55–508 *et seq.*, § 55–515[12] is prac-

---

[11] § 55–79.53. *Compliance with condominium instruments.* - The declarant, every unit owner, and all those entitled to occupy a unit shall comply with all lawful provisions of this chapter and all provisions of condominium instruments. Any lack of such compliance shall be grounds for an action or suit to recover sums due, for damages or injunctive relief, or for any other remedy available at law or in equity, maintainable by the unit owners' association, or by its executive organ or any managing agent on behalf of such association, or, in any proper case, by one or more aggrieved unit owners on their own behalf or as a class action.

[12] § 55–515. *Compliance with declaration.* — Every lot owner, and all those entitled to occupy a lot, shall comply with all lawful provisions of this chapter and all provisions of the declaration. Any lack of such compliance shall be grounds for an action or suit to recover sums due, for damages or injunctive

tically a carbon copy of § 55–79.53. Thus, the Supreme Court's handling of the parallel section in the Condominium Act is persuasive.

First, the Court noted that the property involved in *Frantz* was not subject to the condominium declaration but that the rights asserted over that property, once established, would have been held in common by all unit owners. Under these circumstances, which I believe exist also in the present case, Code § 55–79.53 contemplated that an action to enforce such a commonly-held right is properly maintained by the unit owners association.

Secondly, the Court held that the phrase "in any proper case," as used in § 55–79.53, are words of *limitation* and preclude an action by individual unit owners to enforce a commonly-held right "unless the association fails or refuses to assert the common right." *Id.* at 451. Again, this is clearly applicable to the present case, where identical words of limitation appear in the applicable statute.

Finally, the Court held that the intervenors (and by necessary implication, all other unit owners) were bound by the compromise negotiated by the unit owners association:

> We believe further that the intervenors are bound by the compromise reached between the Association and Fairmac. As noted, the compromise involved a claim for the violation of a common, rather than an individual, right. The compromise was reached by the Association in a representative capacity on behalf of all the unit owners pursuant to its express

---

relief, or for any other remedy available at law or inequity, maintainable by the association, or by its executive organ or any managing agent on behalf of such association, or in any proper case, by one or more aggrieved lot owners on their own behalf or as a class action. The prevailing party shall be entitled to recover reasonable attorneys' fees and costs expended in the matter.

This Act took effect on July 1, 1989, after the Association had filed this suit. However, see the language in § 55–508 which provides, in pertinent part, as follows:

The granting of rights in this Act shall not be construed to imply that such rights did not exist with respect to any association created in the Commonwealth before the effective date of this Act, and no such implication is intended.

Accordingly, the court believes that the Association, even prior to July, 1989, had the representative capacity evidenced by the Property Owners Association Act.

and implied authority. And, so far as the record reveals, the transaction was free of fraud or collusion; indeed, the intervenors do not even contend there was any overreaching or unfairness involved in the Association's settlement with Fairmac.

*Ibid.*

All of these elements apply here. The claim asserted by the Association in the present case represents a common right. The Association stood in a representative capacity on behalf of all the owners of property in London Towne, pursuant to its express and implied authority. There was obviously no collusion between the parties; the matters were fully and fairly litigated in a fiercely adversarial context. As a result, for the same reasons that the unit owners in Fairlington were barred from further litigation of the claim asserted and compromised by their association, so too would the owners of property in London Towne be barred from further litigation of the claims asserted and litigated to conclusion by the Association in this case.

The motion to dismiss is overruled.

### November 21, 1990

Hopefully, this will be the final letter opinion in this case. You have asked me to rule on certain matters that had previously been left unaddressed by my earlier opinions and to reconsider and clarify portions of my earlier rulings, namely: (1) whether the owners of lots 6A and 7A (the only two residential lots in London Towne not encumbered by the protective covenants) are necessary parties to this suit; (2) whether the wife of defendant Keith Thompson, who has an inchoate dower interest in the property owned by him, is a necessary party to the suit; (3) whether the implied negative reciprocal easements over defendants' land are barred by plaintiff's failure to file a claim of interest prior to the escheat; (4) whether the restrictions imposed by this court on the defendants' lands, based on the implied negative reciprocal easements, exceed in scope the restrictions imposed on comparable land under the protective covenants of London Towne; and (5) whether plaintiff's action is barred by the doctrine of laches. My answer to each of the foregoing questions is negative.

1. With respect to the owners of lots 6A and 7A, the same considerations of collateral estoppel that bound all the owners of lots in

London Towne to the results of this action apply as well to these lot owners. *See* my letter opinion of October 4, 1990. There is no conceptual reason why the Association in this case should be more able to bind a lot owner who *is* a member than a lot owner who is not. It is not membership in the association but ownership of a lot in a community developed in accordance with a common scheme that gives rise to the reciprocal easement here enforced.

2. Laurie Thompson, Keith's wife, is not even a proper party, much less a necessary one. The inchoate right of dower she enjoys (at least until next month, when all dower and curtesy ceases) is not a property right in land but a mere contingent expectancy which is not even a vested right. *See*, 6B Michie's Juris. *Dower* § 9 (Repl. Vol. 1985).

3. The plaintiff admittedly failed to file in this court a petition for redress from the escheat of the lands in question, as permitted by § 55–176 of the Code of Virginia. I have previously ruled that this cut off any right it had to set aside the escheat and acquire fee title in itself. However, defendant Thompson now argues that this failure also cut off plaintiff's rights to the benefits of the easements I have determined. That is not so. The simple answer is that escheat does *not* terminate liens and encumbrances on the land escheated. "The state, of course, takes the land subject to any liens created by the owner . . . ." *Sands v. Lynham*, 68 Va. (27 Gratt.) 291, 299 (1876). Thus, the benefit of this implied negative reciprocal easement survives the escheat, as do any express easements for ingress, egress, parking, sewer, water and the like.

4. Defendant Greene's suggestions that the restrictions on her property are more stringent than the restrictions on other open space in the community are without merit. It is true that the covenants do not set a standard for treatment of open space owned by the Association, but the historical pattern of use of these spaces by the Association has been identical to the restrictions imposed on Greene, except that the Association's property is subject to an easement of use and enjoyment by its members, and Greene's is not.

5. Finally, laches is not available as a defense because it was not included in the pre-trial order. Because of the complexity of this case, I called a pre-trial conference pursuant to Rule 4:13 and prepared an order of the kind contemplated by that Rule. "[S]uch order when entered controls the subsequent course of the action, unless

modified at the trial to prevent manifest injustice." R. Sup. Ct. Va. 4:13. The order was not modified at trial, and I believe it would be unfair to do so now after plaintiff has closed its case.

For all the foregoing reasons, the motions to reconsider and to clarify are denied. This letter will serve as the order denying the motions, subject to being vacated anytime within 21 days upon motion of any party for entry of a more formal order incorporating this ruling.

I have today entered (a) the "Order" denying defendant Greene's Motion to Dismiss for Lack of Subject Matter Jurisdiction and (b) the "Final Order" tendered June 27, 1990, incorporating my March 28, 1990, opinion letter.