# Richmond

MID-STATE EQUIPMENT COMPANY, INC. v. EDWARD BELL, JR., ET AL.

June 11, 1976.

Record No. 750887.

Present, Carrico, Harrison, Cochran, Harmon, Poff and Compton, JJ.

*William M. McClenny, Jr.*, for appellant.

*Mosby G. Perrow, III (Caskie, Frost, Hobbs & Hamblen,* on brief), for appellees.

COMPTON, J., delivered the opinion of the court.

We consider in this appeal the equitable doctrine of implied restrictive covenants and its bearing upon the rights of property owners in a residential subdivision. Specifically, the inquiry is whether a restriction for residential use applies to a parcel which appellant Mid-State Equipment Company, Inc., the defendant below, is using for commercial purposes.

The property in controversy, containing about 1.5 acres, is a rectangular parcel of land comprised of two triangular-shaped lots located at the intersection of Waterlick Road and State Route No. 835 (Jefferson Manor Drive) in Campbell County. These lots are designated "James D. & Mary R. Eubank" and "R. N. Clemmons" on the attached sketch, which is a composite of portions of three plat exhibits.

In September 1973 plaintiffs-appellees, property owners in Jefferson Manor, a residential subdivision in Campbell County, filed a bill of complaint seeking to enjoin Mid-State, a corporation engaged in an equipment rental and sale business, from violating certain restrictions, which plaintiffs contended constituted implied reciprocal negative easements or equitable servitudes applicable to Mid-State's property.* The plaintiffs sought an order restraining Mid-State from utilizing the property in question "for any other than residential purposes."

The cause was referred to a commissioner in chancery who filed his report in July 1974 based upon evidentiary hearings which had been held during the preceding March and April, upon certain stipulations of the parties, and upon the commissioner's examination of "the records in the clerk's office of the Circuit Court of Campbell County." The commissioner found that: (1) a business or commercial establishment was being operated on the real estate in question; (2)

---

*When this suit was filed 11 Jefferson Manor property owners were joined as parties plaintiff with 15 other persons, who were owners of property in the vicinity of the parcel in dispute but who were not owners of land in Jefferson Manor. These 15 (including Edward Bell, Jr., who was named first in the caption of the bill) were later found by the commissioner in chancery to be improper parties to the litigation, however under traditional rules of chancery pleading the style of this suit continues to carry Bell's name. B. Lamb, *A Virginia Cause* at 81 n.135 (1955).

- 2 -

PLAT OF

JEFFERSON MANOR

BROOKVILLE MAGISTERIAL DISTRICT

CAMPBELL COUNTY —— VA.

SCALE

0    100    200    300    400

JAMES O. EUBANK AND MARY R. EUBANK, OWNERS

ADRIAN OVERSTREET   S. C. Eng.

FEBRUARY 27, 1960

TOTAL AREA IN SUBDIVISION 13.03 ACRES.

the restrictive covenants in issue were "not expressly or directly applicable to" Mid-State's property; and (3) the property was subject to "implied negative restrictive covenants to the effect that only residential use is to be made of [it]", and operation of Mid-State's business on the property violated these restrictive covenants.

Mid-State excepted to the third finding but the chancellor, after considering the depositions of the commissioners' hearings, the report, and argument of counsel, overruled the exception and confirmed the report. We granted Mid-State an appeal and supersedeas to the April 9, 1975 final decree in which the chancellor enjoined it "from conducting or operating a business or commercial establishment on said property." The trial court further found, after an inspection of the premises, that Mid-State had constructed subsequent to the April 1974 evidentiary hearing "a metal building being utilized as a garage and repair shop for vehicles and equipment." The final decree ordered that this structure be removed from the property.

The relevant facts are not in dispute; they are gleaned, for the most part, from an examination of the deeds and plats of survey filed as exhibits in the record.

The property in question is part of a tract of 85 acres purchased in 1945 by James D. Eubank and Mary R. Eubank, his wife. On February 27, 1960 Adrian Overstreet, a certified land surveyor, prepared at the Eubanks' request a plat (hereinafter Overstreet Plat) for Jefferson Manor Subdivision. A part of the Overstreet Plat is the basis for the foregoing composite sketch. The only portions of the sketch which were not shown on the Overstreet Plat are: lots 13, 14 and 15 in Block B; the shaded part north and west of lots 13 and 14; the shaded triangle marked "R. N. Clemmons" adjoining Waterlick Road; and the shading on the northern portions of lots 4 through 10 in Block B. Not shown on the sketch but comprising the remainder of the Overstreet Plat are lots 1 through 12 in Block A lying to the southwest of Block B along Route 835, a "vicinity" map, a metes and bounds "Description," and "Restrictions" as follows:

"1. No dwelling shall be erected on any lot in this Subdivision at a cost of less than Twelve Thousand Dollars ($12,000.00) based on 1960 building cost.

"2. No livestock (or poultry) shall be kept on any lot in this Subdivision.

"3. The building set-back line shall be 50' from the road (or

street) on which said building fronts and not less than 30' from any side street.

"4. No building shall be erected within 10' of any property line.

"5. *All lots in this Subdivision are restricted to residential use only, house trailers excluded.*" (emphasis supplied)

The evidence shows that when Overstreet prepared his plat the Eubanks resided in a frame dwelling on the lot marked "James D. & Mary R. Eubank". Overstreet testified:

"I was directed by Mr. Eubank to lay out a subdivision of lots for residential use as in accordance with the requirements of the Subdivision Ordinance of Campbell County. And I proceeded to follow his instructions and laid out the lots that are shown here. But, on a parcel of land adjacent to the road on which Mr. Eubank resided, he directed me to leave out a block of land there of a sufficient area to accommodate two building lots, two residential lots, and this, I did. And then the residue of his frontage was cut into lots as shown on this plat."

Overstreet further testified that the "Restrictions" were "dictated" to him by Eubank "and they were put on [the plat] as instructed."

The metes and bounds "Description" found on the lower left-hand corner of the Overstreet Plat includes only the numbered lots in Blocks A and B. The sum of the square feet of (1) lots 1 through 12, Block A; (2) lots 1 through 10, Block B; and (3) the platted street between Blocks A and B, equals approximately 13.03 acres.

Subsequently by deed dated and recorded April 24, 1961, to which was attached the Overstreet Plat, the Eubanks dedicated Jefferson Manor as a subdivision under the county subdivision ordinance. Thereafter the sale of lots in Jefferson Manor commenced, upon which lots residences of brick construction were built.

In May 1962, the Eubanks exchanged land with R. N. Clemmons, who owned property north of and adjacent to Block B of Jefferson Manor. In the exchange, the Eubanks deeded to Clemmons small portions of lots 4 to 10 inclusive in Block B of Jefferson Manor and a small amount of land outside the subdivision. That conveyance was expressly made subject to "all valid existing and recorded easements, restrictions and conditions heretofore imposed on said property." Attached to that deed was a "Plat Showing Land to be Exchanged between James D. Eubank and R. N. Clemmons" dated May 9, 1962

made by Erskine W. Proffitt, surveyor. In return Clemmons conveyed to the Eubanks the unimproved triangular parcel marked "R. N. Clemmons" and shown on the foregoing sketch. The property exchanged is illustrated on the sketch by shading.

In the spring of 1962, the Eubanks continued to subdivide their property and increased the size of Jefferson Manor by adding 12 lots to Block A, by adding Block C north of Block A, and by adding lots 13, 14 and 15 to Block B as shown on the foregoing sketch. This addition, called Section 2, was shown on a plat of survey made by Charles Kirkland, another surveyor, and was dedicated as a subdivision by deed dated June 14, 1962 recorded the next day. This deed contained the same restrictions as shown on the Overstreet Plat.

The next significant event of record occurred in 1966 when by deed dated October 6, 1966 and recorded eight days later, the Eubanks conveyed the property in question, that is, the almost rectangular parcel at the northwest corner of Waterlick Road and Route 835, to James R. Hicks and wife. The description in that deed follows, in part:

"Those certain lots or parcels of ground, together with the buildings and improvements thereon, and the privileges and appurtenances thereunto belonging, situate, lying and being in Brookville Magisterial District, Campbell County, Virginia, and reference is made to two plats of record in the Campbell County Clerk's Office, one of which is designated 'Plat Showing Land To Be Exchanged Between James D. Eubank and Robert N. Clemmons', dated May 9, 1962, made by Erskine W. Proffitt, C.L.S., and of record in the aforesaid Clerk's Office along with a deed dated May 15, 1962 from the parties of the first part to Robert N. Clemmons, Jr. and wife, and the other being 'Plat of Jefferson Manor', made by Adrian Overstreet, S.C.S., February 27, 1960, and of record in said Clerk's Office in Plat Book 16, at page 80, and which property is more particularly described according to said plats as follows: [Then follows a full metes and bounds description]."

Prior to their purchase, the Hickses leased the property from the Eubanks using the frame dwelling as a residence. The testimony shows that sometime after February 1960 and before February 1962 the Eubanks had moved from that dwelling to a dwelling on Lot 5, Block B, Jefferson Manor, which dwelling was also in existence when Overstreet drew his plat. The record further shows that during the

interim between the Eubanks' occupancy and that of the Hickses the dwelling on the parcel in question was rented by the Eubanks to one Crouch, who used it for a residence.

The Hickses continued to reside on the disputed property until 1973. In February of that year Hicks authorized Joseph E. Champe, a real estate salesman with Ted Sims Realty of Lynchburg, to seek a buyer for the parcel. During April and June of 1973 the property was advertised for sale in the local newspapers as commercial property. In addition, a "billboard sign" four feet high and eight feet long was placed on the property in an elevated position stating "Ted Sims —Sale—Real Estate—845-2383."

On June 10, 1973 a contract for sale of the property for $20,500 was executed by the Hickses and the president of Mid-State, Robert E. Bankert. The contract provided: "Offer subject to confirmation of commercial zoning and business financing . . . ." Champe testified that he sold the parcel as commercial property after making an independent investigation of the land records and satisfying himself that a commercial use of the property was not prohibited by the restrictions of record. Champe also stated that the frame dwelling on the premises was then in "delapidated condition" and that the parcel was worth only about $15,000 as residential property.

By deed dated July 3, 1973, drawn on stationery of Mid-State's attorney, and recorded July 9, 1973, the Hickses conveyed the subject property to Mid-State. The deed contained the following provision:

> "This land is specifically not subject to subdivision restrictions of record of Jefferson Manor."

On the day the deed was drawn, a separate agreement between the parties was executed which permitted the Hickses to continue to occupy the frame dwelling on the premises upon payment of a monthly rental, until the Hickses were able to acquire possession of the house they were arranging to purchase. This agreement also permitted Mid-State to use the grounds for any purpose including storage of its "heavy equipment."

Bankert, Mid-State's sole stockholder, testified he instructed Champe "to check the property close, because there were houses bumping up on both sides, and I didn't want any clouds on it". By this time residential subdivisions similar to Jefferson Manor with homes valued from $18,000 to $40,000 had been and were being de-

veloped to the north of Jefferson Manor (White Pine Acres, which was platted for Clemmons in 1962), to the east of Jefferson Manor across Waterlick Road (Nottingham Forrest platted in 1971); and to the south of Jefferson Manor across Route 835 adjacent to Waterlick Road (Westwood Manor surveyed in 1964). Bankert stated he agreed to purchase after Champe and Mid-State's attorney reported the parcel was not subject to the residential restrictions.

Mid-State occupied the premises and later made extensive improvements to the dwelling, at a cost of about $14,000, to convert it to an office for the sale and rental of solid waste equipment. The equipment consists of refuse bodies and new "health containers" which are stored on the lot pending delivery to customers. Also maintained on the premises are Mid-State's tractor and trailer, its service truck, and a "boom" for lifting the containers.

Shortly after Mid-State commenced its use of the property, a number of the plaintiffs and other homeowners in the area petitioned the county board of supervisors objecting to the establishment of the "garbage container storage site". Campbell County had no zoning ordinance and the board took no action on the petition. After an effort of several homeowners to buy the property from Mid-State failed, this suit was filed.

The dispositive issue is raised by Mid-State's contention that the trial court erred "in applying an implied reciprocal negative easement in favor of the plaintiff[s]." Being of opinion the trial court did not err, we affirm.

Covenants, express or implied, restricting the free use of land are not favored and must be strictly construed. *See Traylor* v. *Holloway*, 206 Va. 257, 259, 142 S.E.2d 521, 522-23 (1965). Nevertheless, when applicable they will be enforced, but the burden is on the person claiming the benefit of the restrictions to prove they are applicable to the acts of which he complains. *Riordan* v. *Hale*, 215 Va. 638, 641, 212 S.E.2d 65, 67 (1975); *Stevenson* v. *Spivey*, 132 Va. 115, 119-20, 110 S.E. 367, 368 (1922).

The doctrine of restrictive covenants in equity, distinct from the common law doctrine of covenants running with the land, establishes rights and obligations known as equitable easements and equitable servitudes. *Minner* v. *City of Lynchburg*, 204 Va. 180, 187, 129 S.E.2d 673, 678 (1963); *Cheatham* v. *Taylor*, 148 Va. 26, 37, 138 S.E. 545, 548 (1927). The doctrine is that "when, on a transfer of land, there is a covenant or even an informal contract or understand-

ing that certain restrictions in the use of the land conveyed shall be observed, the restrictions will be enforced by equity, at the suit of the party or parties intended to be benefited thereby, against any subsequent owner of the land except a purchaser for value without notice of the agreement. The principal purposes of such agreements are to regulate the style and costs of buildings to be erected on a tract that is being sold in parcels for building lots, to restrict their location to certain distances from the street, and to prevent buildings in a locality from being put up or used for any other than residential purposes." 148 Va. at 37-38, 138 S.E. at 548. The equity which is enforced prevents a third person, who has actual or constructive notice, from violating the equitable rights of another. 148 Va. at 39, 138 S.E. at 549.

The intent of the parties, especially that of the common grantor, determines the existence of the right. *Minner, supra,* 204 Va. at 187-88, 129 S.E.2d at 678-79; *Cheatham, supra,* 148 Va. at 39, 138 S.E. at 549. In ascertaining the parties' intention, we examine the words used in the restriction, the plats, the deeds, such surrounding circumstances as the parties are presumed to have considered when their minds met, the purpose to be achieved by the covenant, and the use of the property, keeping in mind that such a restriction is not merely for the grantor's benefit but that it assures purchasers that property will be devoted in a specified manner to the intended purpose. *Whitehurst* v. *Burgess,* 130 Va. 572, 577-78, 107 S.E. 630, 632 (1921).

And where a common grantor develops land for sale in lots and pursues a course of conduct which indicates an intention to execute a general scheme or plan of improvement for the benefit of himself and the purchasers of the various lots, and by numerous conveyances incorporates in the deeds substantially uniform restrictions, conditions and covenants against the use of the property, the grantees acquire by implication the equitable right, sometimes referred to as an implied reciprocal negative easement, to enforce similar restrictions against the residential lot or lots retained by the grantor or subsequently sold without the restrictions to a purchaser with actual or constructive notice of the restrictions and covenants. *See Minner, supra,* 204 Va. at 188, 129 S.E.2d at 679.

As we apply the foregoing principles to these facts, we must first determine whether the intention of the parties has been sufficiently proved to establish the equitable right. If existence of the right is not proved, our inquiry ends and Mid-State would prevail. But if the

equitable right is established, then the plaintiffs prevail, if Mid-State had actual or constructive notice of such right.

When we examine the words of the restriction, the plats, the deeds, and the surrounding circumstances, we think the evidence clearly establishes a course of conduct on the part of the Eubanks which indicates they intended to create and execute a general scheme of residential development of the property within Jefferson Manor for the benefit of themselves and the purchasers of the lots in the subdivision and, further, that the parcel in question was intended to be included within this plan of development, subject to the residential restriction in controversy. The general plan of residential development of the numbered lots is apparent. Indeed, Mid-State does not dispute the fact that all numbered parcels in Blocks A and B were made expressly subject to the restriction for residential use either by a deed reference to the Overstreet Plat or by inclusion of the restriction in the body of the deeds. So the only real controversy in this branch of the case is whether the parcel in question was included in the plan of development, and we conclude that it was.

First, the Eubanks' home was located on the "James D. & Mary R. Eubank" parcel when the development began in 1960, and it was used for residential purposes by the Eubanks until they sold it in 1966. Second, we have the unchallenged testimony of Overstreet, the surveyor, that he was instructed by Eubank to "leave out" of the platted area sufficient land for two residential lots. This manifestation of Eubank's intent in 1960 is buttressed by what occurred during the subsequent development in June 1962 when lots 13, 14 and 15 were added to Block B which theretofore had included only lots 1-10. It is apparent from this omission of numbered lots 11 and 12 that the "James D. & Mary R. Eubank" parcel was intended to be residential lots 11 and 12. The conclusion is strengthened when we blend the foregoing facts with other circumstances, which standing alone may not be sufficient to establish intent. For example, the property is shown on the Overstreet "Plat of Jefferson Manor" as an unreserved delineated lot; the residential restriction on the face of the plat refers to "[a]ll lots in this subdivision", not all numbered lots; and when the 1966 conveyance to the Hickses took place, after the 1962 Clemmons exchange expanded the size of the Eubank parcel, the deed made specific reference to the Overstreet Plat containing the restriction. Accordingly the foregoing evidence considered as a whole establishes the equitable right, even though the subject property was not in-

cluded within the metes and bounds description or within the 13.03-acre reference on the Overstreet Plat.

■ And we also think Mid-State, through its president and attorney, had notice of the established equitable right. Even if we disregard the effect of the matters of record to which we have just adverted, a view of the property from the ground would have revealed the uniform residential development surrounding the subject parcel and would have been sufficient to put a purchaser on inquiry as to whether there was a general plan to which the restriction applied. *Sanborn* v. *McLean*, 233 Mich. 227, 232-33, 206 N.W. 496, 498 (1925); Annot. 4 A.L.R.2d 1364, 1371. Indeed, Bankert ordered a close "check" of the property because "there were houses bumping up on both sides", and the fact that the realtor and Mid-State's attorney concluded the property was not subject to the residential restriction does not establish lack of notice.

We have fully considered Mid-State's other assignments of error dealing with laches (failure of plaintiffs to object until after purchase even though they were placed on notice of pending sale by the newspaper and "billboard" ads); questions of evidence; and a constitutional issue. The constitutional question was not raised below, so we will not notice it on appeal, and we find no merit in the other errors assigned.

For these reasons, the final decree of the trial court is

*Affirmed.*

COCHRAN, J., dissenting.

I do not agree that an implied reciprocal negative easement has been established in this case. The property in question was not included in the "Description" found on the Overstreet Plat of Jefferson Manor Subdivision. Therefore, we are not dealing with the omission of restrictive covenants from a deed to a numbered lot in this subdivision, where the intent to apply such covenants to all numbered lots may be implied. The subdivider reserved an unnumbered lot adjoining the subdivision, and there is at least as strong an implication that there was a deliberate exclusion of this property from subdivision restrictions as that there was an intent to make the property subject to the restrictions.

Nor do I find sufficient evidence of notice. A title examiner could no more determine, from the land records, the probability of applica-

tion of restrictive easements to this property than he could determine title by adverse possession. To hold that implied reciprocal negative easements apply to the subject property is to impose an intolerable burden on the title examiner which, in my view, cannot be justified. I regard the majority opinion as an extension of principles enunciated in *Minner* v. *City of Lynchburg*, 204 Va. 180, 129 S.E.2d 673 (1963), which I am unwilling to approve.