PATRICK J. EGAN, APPELLANT, V. THE CATHOLIC BISHOP OF
LINCOLN, A NEBRASKA NONPROFIT CORPORATION, ET AL.,
APPELLEES.

363 N.W.2d 380

Filed March 1, 1985.   No. 84-061.

Rodney M. Confer of Knudsen, Berkheimer, Richardson & Endacott, for appellant.

Robert B. Crosby of Crosby, Guenzel, Davis, Kessner & Kuester, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

Plaintiff-appellant, Patrick J. Egan, seeks a mandatory injunction requiring defendants-appellees, The Catholic Bishop of Lincoln, a nonprofit corporation hereinafter referred to as the corporate bishop, and the Sister Servants of the Holy Spirit of Perpetual Adoration, Inc., a nonprofit corporation hereinafter referred to as the corporate Sisters, to remove or alter a structure claimed to have been erected by the corporate bishop and Sisters in violation of a reciprocal negative easement. Egan appeals from the dismissal of his petition, assigning as error the trial court's determination that the doctrine of reciprocal negative easements does not apply in Nebraska; its failure to find there exists a common plan

restricting the portion of the subdivision in which the new structure was built to private, one-family residential use; and its finding that the corporate bishop and Sisters had no notice of the restriction. The corporate bishop and Sisters defend on the ground, among others, that Egan, if the claimed easement or restriction exists, waived his right to enforce it by virtue of his knowledge of the construction prior to the purchase of his property. We agree with that defense and therefore find it unnecessary to resolve Egan's assignments of error. We affirm.

The property in question was originally acquired by Charles Stuart in 1925 and became what is now known as the Piedmont Addition of Lincoln. In 1926 Stuart, together with his wife, conveyed the property without use restrictions to Stuart Investment Company, in which he owned a controlling interest and through which he developed the addition. The original plat of the addition, filed on June 4, 1927, contained no restrictive covenants or encumbrances.

Stuart built his house on two and a half lots of the addition, which remained titled in the development company throughout his life.

The remaining $107\frac{1}{2}$ lots in the residential portion of the addition were sold over a 30-year period. All of these remaining lots were bound by identical provisions in the conveying deeds restricting the properties to private, one-family residential use. In accordance with Stuart's plan, 2 of the 16 blocks in the addition were given to the city of Lincoln for parks, 1 lot was sold to the city for a nominal consideration in order that a fire station might be built, and 1 block was restricted to business uses.

Stuart lived in his house until his death in 1938. Following Stuart's death, his widow remained in the home for 4 additional years. Thereafter, Stuart's son took possession of the house under a lease restricting use of the property to "a home, and for no other purpose whatever." Following the death of Stuart's widow, the property was conveyed to the son on September 1, 1943, without restrictions on the use to be made of it and "free from encumbrance."

The son, after living on the property for several years, conveyed it to Philip S. Hardy by a warranty deed in 1951. The

deed warranted that the property was "free and clear of all incumbrance." The son testified that "there was nothing in writing in any restrictive covenant to the prior deeds in that — on that piece of property that was conveyed to me, and there was no reason to impose any other covenant than what was in the original deed." It was the son's understanding that Hardy intended to use the property as a home for himself and his family.

On January 28, 1960, Hardy conveyed the property to the corporate bishop by a deed warranting that the property was "free from encumbrance, except easements, reservations and restrictions of record." The minutes of the meeting at which the board of the corporate bishop voted to purchase the property recite that the meeting was called "for the purpose of deciding whether the Hardy home should be purchased as a Bishop's residence." The corporate bishop's offer to purchase the house was conditioned on the property's being free from encumbrance. The abstract of title to the corporate bishop's property, prepared on January 13, 1960, contained no restrictive covenants but did reflect the aforedescribed lease with the son and the plat of the subdivision showing the undivided lot, one-half of which ultimately became the corporate bishop's property. The first reference in the abstract of that half lot is the son's lease.

The then bishop of the Lincoln Diocese, Bishop Casey, lived in the house from 1960 until 1967. In 1967 the present bishop and president of the corporate bishop, Bishop Flavin, began living in the house. In testifying about the use made of the house, Flavin stated that in addition to being where a bishop "eats and sleeps," it is where he "does his most important work." It is where "we make all our plans. It's where I do all of my homework. It's where I meet people to discuss problems and projects with. It's a place where I do my . . . official writing as a bishop." Flavin testified that he had an office on the property as well as at another location in Lincoln.

In 1973 Flavin decided to change his residence, whereupon the corporate bishop obtained a special permit from the Lincoln City Council for six members of the corporate Sisters to occupy the house. The application for the permit specified

that the house was to be used as a temporary home for the Sisters, whose residency was "not to exceed two years," that they would "live together as a single housekeeping unit," and that "[n]o more than three automobiles will be parked or stored on or near the premises by the Sisters who reside on the premises."

In 1977 Flavin developed plans to build a separate, new and additional structure on the subject property to house an altar and sanctuary and to provide some additional sleeping quarters. On April 18, 1979, the corporate bishop obtained a building permit to construct the new structure.

On June 1, 1979, approximately a month and a half after the corporate bishop obtained its building permit, Robert Buchman and others sought to restrain the construction but were unsuccessful. Although the record establishes further unsuccessful activity by the plaintiffs in that suit, it does not reflect the status of the suit at the time of the trial of this action.

Egan purchased his property, which consists of the half lot to the south of and adjoining the corporate bishop's property and a full lot south of and adjoining the half lot, on November 14, 1979. The three other sides of the corporate bishop's property abut streets. Prior to his purchase, Egan had, on September 30, 1973, joined an organization which supports the corporate Sisters, and on one occasion visited the corporate bishop's property. At that time the property was "basically like the other homes in Piedmont," although the house contained a chapel with an altar and a cloister. There were no parking lots and but one building, the house. Egan testified that he received mailings from the organization in 1973 but had not received any for several years, until after he filed the suit. He at no time made inquiry of any of the members of the corporate Sisters concerning the new structure.

At the time of his purchase, according to Egan, construction was pretty well along on the corporate bishop's new structure,

> but there were no parking lots as such. The window, this large glass window, had not been put in, to my recollection, and the workmen were over there building.
>
> The side parking lot between the structure and my home was not there. There was a grass area and a crushed rock

drive.

The front of the house had not been changed or by the parking area had not been changed. The driveway had not been widened and parking stalls had not been put out in front.

An architect for the firm which designed the new structure testified that based on the proportion of construction costs owed, the building was 73 percent completed on November 1, 1979, and 86 percent completed on November 30, 1979. He also testified, however, that a layman would not have been able to judge the percentage of completion by looking at the building.

The new structure and parking lot were completed in May 1980. Testimony established that, following construction, the appearance of the property had changed. Egan described the following changes:

Well, they have added the large parking lot between the new addition to the building and my lot line. They have, I'd say, quadrupled the size of the driveway in front of the building which would be facing South Cotner Boulevard with parking stalls along the entire drive. I don't mean horizontal parking lot, I mean more a vertical parking stall in nature.

Those would be the major changes, I guess, from the time I moved in.

They have added outdoor lighting or parking lot type lighting.

Father Pleskac, chaplain to the members of the corporate Sisters who had occupied the corporate bishop's house, testified that after construction was completed the area between the new structure and Egan's property line had been paved for a parking lot and that additional spaces were paved along the circular driveway in front of the house. In addition, a new driveway allowed traffic to enter the parking lot from a public street.

Egan testified that at the time he bought his property he believed that all property in Piedmont was restricted to one-family residential use. Egan knew of the construction on the corporate bishop's property before he began to negotiate his purchase but took no action in an effort to stop it because he owned no interest to protect at that time. When he purchased

his property, he did not expect the construction to be completed because he knew of the Buchman lawsuit and thought it would be successful. Egan also testified that once he had moved onto his new property, he discussed the Buchman lawsuit with his neighbors. He wanted to add his suit to the Buchman suit, but found he was unable to do so and proceeded to file this action within 2 weeks of his purchase.

The reciprocal negative easements doctrine holds that where a common grantor develops land for sale in lots and pursues a course of conduct which indicates an intention to execute a general scheme or plan of improvement for the benefit of himself and the purchasers of the various lots, and by numerous conveyances incorporates in the deeds substantially uniform restrictions, conditions, and covenants against the use of the property, the grantees acquire by implication the equitable right to enforce similar restrictions against the residential lot or lots retained by the grantor or subsequently sold without the restrictions to a purchaser with actual or constructive notice of the restrictions and covenants. *Mid-State Equipment Co. v. Bell*, 217 Va. 133, 225 S.E.2d 877 (1976). See, also, *Warren v. Detlefsen*, 281 Ark. 196, 663 S.W.2d 710 (1984); *Arnold v. Chandler*, 121 N.H. 130, 428 A.2d 1235 (1981); *Bomar v. Echols*, 270 S.C. 676, 244 S.E.2d 308 (1978); *Land Developers, Inc. v. Maxwell*, 537 S.W.2d 904 (Tenn. 1976); *Sanborn v. McLean*, 233 Mich. 227, 206 N.W. 496 (1925).

Although we have enforced restrictive covenants when contained in the grantee's chain of title, *Plumb v. Ruffin*, 213 Neb. 335, 328 N.W.2d 792 (1983), *Pool v. Denbeck*, 196 Neb. 27, 241 N.W.2d 503 (1976), *Reed v. Williamson*, 164 Neb. 99, 82 N.W.2d 18 (1957), *Hogue v. Dreeszen*, 161 Neb. 268, 73 N.W.2d 159 (1955), and *Wright v. Pfrimmer*, 99 Neb. 447, 156 N.W. 1060 (1916), we have not had occasion to consider whether we would adopt the reciprocal negative easements doctrine and enforce a restriction not contained in the grantee's chain of title. Nor do we reach the question now. For we conclude from our de novo review, *Pool v. Denbeck, supra*, that even if we were to adopt the doctrine and even if the evidence in this case were to establish the elements of the doctrine to be present, matters we do not decide, Egan waived

his right, if any, to enforce the easement or restriction.

Although not directly in point, in enforcing a restriction, we observed in *Meierhenry v. Smith*, 208 Neb. 88, 302 N.W.2d 365 (1981), that the right to enforce a restrictive covenant may be waived by acquiescing in its violation, the circumstances of each case controlling whether there has been such a waiver. Egan did not acquiesce in the violation of any use restriction which may pertain to the corporate bishop's property; however, it is uncontroverted that Egan knew before as well as during the negotiations for the purchase of his property that construction of a new structure was proceeding on the corporate bishop's property notwithstanding a pending legal challenge to the construction. We hold that under those circumstances Egan waived any right he may have had to enforce any restriction which might arise through the reciprocal negative easements doctrine. See *Ludke v. Egan*, 87 Wis. 2d 221, 274 N.W.2d 641 (1979), holding that purchasers who knew at the time of their purchase of the existence of a road across their land, resulting in the subsequent declaration of an easement in favor of a third party, were in no position to claim the breach of a covenant against encumbrances.

Egan seeks to avoid this result by analogizing the violation of a reciprocal negative easement to the maintenance of a nuisance. We have held that one's right to enjoin a nuisance is not defeated by the fact that he purchased his property after the nuisance came into existence. *Seifert v. Dillon*, 83 Neb. 322, 119 N.W. 686 (1909). The analogy, however, is inapposite. The law does not tolerate a nuisance, because it is essentially unlawful or wrongful in character. *City of Omaha v. Flood*, 57 Neb. 124, 77 N.W. 379 (1898). On the other hand, the law disfavors restrictions on the use of land. *Knudtson v. Trainor*, 216 Neb. 653, 345 N.W.2d 4 (1984). Thus, the law of nuisances bears no relationship to the question of when one has waived the right to enforce a restriction on the use of land.

The trial court's judgment of dismissal is correct and is affirmed.

AFFIRMED.

KRIVOSHA, C.J., not participating in the decision.