Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/20/2017 09:13 AM CDT

Gary J. Walters et al., appellants, v.
Steven W. Colford et al., appellees.

___ N.W.2d ___

Filed July 28, 2017.    No. S-16-641.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

2. ____: ____. In reviewing a summary judgment, the court views the evidence in the light most favorable to the party against whom the judgment was granted and gives such party the benefit of all reasonable inferences deducible from the evidence.

3. **Trial: Juries: Evidence.** Where the facts are undisputed or are such that reasonable minds can draw but one conclusion therefrom, it is the duty of the trial court to decide the question as a matter of law rather than submit it to the jury for determination.

4. **Summary Judgment: Evidence: Proof.** A movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to a judgment if the evidence were uncontroverted at trial. At that point, the burden of producing evidence shifts to the party opposing the motion, who must present evidence showing the existence of a material fact that prevents summary judgment as a matter of law.

5. **Restrictive Covenants.** When restrictive covenants are created for the mutual benefit of all of the properties within a development, they may be enforced by each of the property owners against the other.

6. ____. The doctrine of implied reciprocal negative servitudes allows— under very limited circumstances—a servitude to be created by implication, even where no express servitude applies to the property at issue.

7. ____. The requirements for the application of the doctrine of implied reciprocal negative servitudes are as follows: (1) There is a common

grantor of property who has a general plan or scheme of development for the property; (2) the common grantor conveys a significant number of parcels or lots in the development subject to servitudes (restrictive covenants) designed to mutually benefit the properties in the development and advance the plan of development; (3) it can be reasonably inferred, based on the common grantor's conduct, representations, and implied representations, that the grantor intended the property against which the servitude is implied to be subject to the same servitudes imposed on all of the properties within the plan of development; (4) the property owner against whom the restriction is enforced has actual or constructive notice of the implied servitude; (5) the party seeking to enforce the restriction possesses an interest in property in the development that is subject to the servitude and has reasonably relied upon the representations or implied representations of the common grantor that other properties within the general scheme of development will be subject to the servitude; and (6) injustice can be avoided only by implying the servitude.

8. ____. The law disfavors restrictions on the use of land. Logically, if express restrictive covenants are disfavored under the law, implied restrictive covenants are to be viewed with even less favor.

9. ____. Because implied restrictive covenants mandate relaxation of the writing requirement, courts are generally reluctant and cautious to conclude implied restrictive covenants exist.

10. ____. The doctrine of implied reciprocal negative servitudes should be applied with extreme caution because in effect it lodges discretionary power in a court to deprive a person of his or her property by imposing a servitude through implication.

11. **Property: Boundaries.** Whether a general plan or scheme of development exists and the scope and boundary of that plan are questions of fact.

12. **Property: Intent: Proof.** A grantor's intent to create a plan of development may be proved from the conduct of parties or from the language used in deeds, plats, maps, or general building development plans and by looking to matters extrinsic to related written documents, including conduct, conversation, and correspondence.

13. **Property: Boundaries: Presumptions.** Where property is subdivided or platted pursuant to a plan of development, a presumption arises that the plan of development includes only those properties in the plat or subdivision.

14. **Restrictive Covenants.** The property included within a plan of development, for purposes of the doctrine of implied reciprocal negative servitudes, does not necessarily include all of the developer's land, but can be limited to certain well-defined similarly situated lots.

15. **Property: Boundaries.** Where a development is subdivided or platted in separate phases, each phase constitutes its own separate plan of development.

16. **Restrictive Covenants.** The doctrine of implied reciprocal negative servitudes has no application where a developer follows the practice of creating restrictions on a development through a declaration of restrictions.

17. ____. A buyer of property has no reasonable expectation that neighboring property will be restricted as part of a plan of development pursuant to the doctrine of implied reciprocal negative servitudes where the entire development has been restricted through a declaration of restrictions that does not include that neighboring property.

18. ____. The purpose of the doctrine of implied reciprocal negative servitudes is to protect the reasonable expectations of purchasers of property who reasonably rely on the representations or implied representations of a developer that the other properties within a development will be restricted.

19. ____. Limiting the scope of the implied reciprocal servitudes doctrine to situations where restrictive covenants are placed in individual deeds serves the interest of promoting reliance on our property recording system.

Appeal from the District Court for Butler County: Mary C. Gilbride, Judge. Affirmed.

Jeffrey A. Silver for appellants.

Todd B. Vetter and Luke P. Henderson, of Fitzgerald, Vetter, Temple & Bartell, for appellees Steven W. Colford and Sara J. Colford.

Robert J. Bierbower for appellee Daniel F. Adamy.

Heavican, C.J., Wright, Miller-Lerman, Stacy, Kelch, and Funke, JJ.

Wright, J.
## I. NATURE OF CASE
At issue in this case is whether the property owned by Steven W. Colford and Sara J. Colford is subject to the neighboring subdivision's restrictive covenants by virtue of the doctrine of implied reciprocal negative servitudes. The

district court concluded that it was not and granted summary judgment to the appellees, the Colfords and Daniel F. Adamy. We affirm.

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

The appellants, Gary J. Walters and Denise R. Walters, as cotrustees of the Gary J. Walters and Denise R. Walters Trust; Aaron Schmid; Jacquelyne J. Romshek; and Cory Micek (collectively the plaintiffs), brought suit against the Colfords and Adamy. The suit alleges three claims: mandatory injunction for violation of the neighboring subdivision's restrictive covenants, nuisance (derived from the alleged restrictive covenants violation), conspiracy to violate the restrictive covenants, and invasion of privacy (later voluntarily dismissed without prejudice by the plaintiffs).

The Colfords moved for summary judgment. The district court granted the motion with respect to the mandatory injunction claim and the nuisance claim, but not with respect to the invasion of privacy claim. The court's order did not address the conspiracy claim. The court set a pretrial hearing for the remaining issues in the case. The plaintiffs appealed from the court's order. The appeal was dismissed for lack of a final, appealable order. The plaintiffs then voluntarily dismissed their invasion of privacy claim without prejudice. The Colfords again moved for summary judgment, and Adamy joined this motion. The district court granted the motion with respect to the only remaining issue, the conspiracy claim, concluding that because the covenants did not apply to the Colfords' property, there could be no civil conspiracy to violate the covenants. The plaintiffs appealed, and we subsequently moved this case to our docket.

### 2. FACTUAL BACKGROUND

The plaintiffs are neighbors to the Colfords. The plaintiffs live in a platted subdivision known as the Adamy subdivision.

The Adamy subdivision was platted and dedicated in 1976, and the founding documents were filed with the Butler County register of deeds. The plat and dedication included restrictive covenants, which, among other things, limited the structures on the lots to one single-family, two-story house and one two- or three-car garage. The subdivision contains 14 lots created from a piece of property consisting of around 16.5 acres. The Adamy family also owned much of the property adjacent to the subdivision, including the entire quarter-section (approximately 160 acres) of land in which the subdivision was located.

Adamy later sold some of the property adjacent to the Adamy subdivision without restrictive covenants, including to the Walters. Adamy hired two real estate agents to sell some of the lots in the Adamy subdivision that remained unsold as well as some adjoining property. Adamy did not remember when he hired the two agents.

The record contains promotional brochures produced by the two real estate agents advertising the sale of properties owned by Adamy. The brochures listed the property for sale under the names "Adamy Division" and "Valley View Subdivision." The brochures contained maps of the properties for sale, displaying lots within the Adamy subdivision alongside adjacent property owned by Adamy. That adjacent property included portions or all of the property later sold to the Colfords (the Colford Property), a 5-acre parcel immediately to the west of the Adamy subdivision. One of the brochures listed the restrictive covenants applicable to the Valley View subdivision and said, "These covenants may change. Contact listing agents for more information" (emphasis omitted). Adamy testified that he did not approve of any of the advertising materials produced by his real estate agents.

The Colfords purchased 5 acres of property from Adamy in 2013 for $25,000. When Adamy sold the property to the Colfords, the property was not subject to any restrictive covenants. Later, Adamy placed restrictions on the property that

he and the Colfords negotiated. These new restrictions on the Colford Property were different from those in place on the Adamy subdivision. He testified that he never intended to make the Colford Property subject to the same restrictive covenants that were in place on the Adamy subdivision. The Colfords were aware that there were restrictive covenants in place on the Adamy subdivision, but did not know their details.

After purchasing the property, the Colfords constructed a large metal building, approximately 30 by 50 feet, which the plaintiffs alleged was in violation of the Adamy subdivision covenants. The Colfords used the building to store building material to build a house on the property.

## III. ASSIGNMENT OF ERROR

The Walters claim that the district court erred as a matter of law in granting each of the two motions for summary judgment.

## IV. STANDARD OF REVIEW

[1,2] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[1] In reviewing a summary judgment, the court views the evidence in the light most favorable to the party against whom the judgment was granted and gives such party the benefit of all reasonable inferences deducible from the evidence.[2]

[3,4] Where the facts are undisputed or are such that reasonable minds can draw but one conclusion therefrom, it is

---

[1] *Pierce v. Landmark Management Group, Inc.*, 293 Neb. 890, 880 N.W.2d 885 (2016).

[2] *Id.*

the duty of the trial court to decide the question as a matter of law rather than submit it to the jury for determination.[3] A movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to a judgment if the evidence were uncontroverted at trial.[4] At that point, the burden of producing evidence shifts to the party opposing the motion, who must present evidence showing the existence of a material fact that prevents summary judgment as a matter of law.[5]

## V. ANALYSIS

### 1. The Plaintiffs' Claim for Injunctive Relief: Adamy Subdivision Restrictive Covenants Do Not Expressly Apply to the Colford Property

There is no evidence that the Colford Property is expressly subject to the Adamy subdivision restrictive covenants. The Colford Property is not a part of the Adamy subdivision. The Adamy subdivision restrictive covenants expressly apply only to the lots within the subdivision. The plaintiffs may prevail only if they can establish that the Colford Property is restricted through the doctrine of implied reciprocal negative servitudes.

### 2. The Plaintiffs' Claim for Injunctive Relief: Application of Doctrine of Implied Reciprocal Negative Servitudes to the Colford Property

The plaintiffs argue that the Colford Property is subject to the Adamy subdivision restrictions through the doctrine of implied reciprocal negative servitudes. The district court concluded that there was no material issue of fact as

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

to the application of the doctrine because "[a]lthough all of the land at issue was conveyed by a common grantor, there is no showing that the grantor had a common plan of development for the Colford land or had any intent to restrict the use of it."

### (a) Overview of Doctrine

[5] Restrictive covenants on property use are often utilized in developments to maintain the character of the neighborhood in accord with the development plan and to protect property values.[6] When restrictive covenants are created for the mutual benefit of all of the properties within a development, they may be enforced by each of the property owners against the other.[7] While at common law, restrictive covenants on land use were categorized as either "real covenants" or "equitable servitudes" depending on whether they were enforced in law or equity, the distinction between these two has blurred over time.[8]

---

[6] See, generally, 1 Restatement (Third) of Property: Servitudes § 2.14, comment *a*. (2000); *Citizens for Cov. Comp. v. Anderson*, 12 Cal. 4th 345, 352, 906 P.2d 1314, 1318, 47 Cal. Rptr. 2d 898, 902 (1995) ("[m]odern subdivisions are often built according to a general plan containing restrictions that each owner must abide by for the benefit of all").

[7] See, *Plumb v. Ruffin*, 213 Neb. 335, 328 N.W.2d 792 (1983); *Reed v. Williamson*, 164 Neb. 99, 82 N.W.2d 18 (1957). See, generally, 1 Restatement, *supra* note 6.

[8] 9 Richard R. Powell & Michael Allan Wolf, Powell on Real Property § 60.01[5] at 60-11 (2000). See, generally, *id*., § 60.01[4] and [5]; 7 Thompson on Real Property §§ 61.02(b) and (c) and 61.05 (David A. Thomas 2d ed. 2006); 1 Restatement, *supra* note 6, §§ 1.4 and 2.1, comment *a.*; *Citizens for Cov. Comp. v. Anderson, supra* note 6, 12 Cal. 4th at 348, 906 P.2d at 1316, 47 Cal. Rptr. 2d at 900 (referring to law of real covenants and equitable servitudes as "'the most complex and archaic body of American property law remaining in the twentieth century'" and as "'an unspeakable quagmire'").

The modern trend, as represented by the Restatement (Third) of Property: Servitudes,[9] is to refer to both real covenants and equitable servitudes simply as servitudes.

[6,7] The doctrine of implied reciprocal negative servitudes[10] allows—under very limited circumstances—a servitude to be created by implication, even where no express servitude applies to the property at issue. The requirements for the application of this doctrine are as follows: (1) There is a common grantor of property who has a general plan or scheme of development for the property;[11] (2) the common grantor conveys a significant number of parcels or lots in the development subject to servitudes (restrictive covenants) designed to mutually benefit the properties in the development and advance the plan of

_____

[9] See, 1 Restatement, *supra* note 6, §§ 1.3 and 1.4; 9 Powell & Wolf, *supra* note 8, § 60.01[6]. See, also, generally, Lawrence Berger, *Integration of the Law of Easements, Real Covenants and Equitable Servitudes*, 43 Wash. & Lee L. Rev. 337 (1986); Uriel Reichman, *Toward a Unified Concept of Servitudes*, 55 S. Cal. L. Rev. 1177 (1982); Ralph A. Newman & Frank R. Losey, *Covenants Running with the Land, and Equitable Servitudes; Two Concepts, or One?*, 21 Hastings L.J. 1319 (1970).

[10] See, generally, 1 Restatement, *supra* note 6, § 2.14; 20 Am. Jur. 2d *Covenants, Etc*. § 156 (2015); 21 C.J.S. *Covenants* § 4 (2016); *Krueger v. Oberto*, 309 Ill. App. 3d 358, 724 N.E.2d 21, 243 Ill. Dec. 712 (1999); *Schovee v. Mikolasko*, 356 Md. 93, 737 A.2d 578 (1999); *Evans v. Pollock*, 796 S.W.2d 465 (Tex. 1990); *Sharts v. Walters*, 107 N.M. 414, 759 P.2d 201 (N.M. App. 1988); *Mid-State Equipment Co. v. Bell*, 217 Va. 133, 225 S.E.2d 877 (1976); *Williams v. Waldrop*, 216 Ga. 623, 118 S.E.2d 465 (1961); *Nashua Hospital v. Gage*, 85 N.H. 335, 159 A. 137 (1932); *Sanborn v. McLean*, 233 Mich. 227, 206 N.W. 496 (1925).

[11] *Skyline Woods Homeowners Assn. v. Broekemeier*, 276 Neb. 792, 758 N.W.2d 376 (2008); *Egan v. Catholic Bishop*, 219 Neb. 365, 363 N.W.2d 380 (1985).

development;[12] (3) it can be reasonably inferred, based on the common grantor's conduct, representations, and implied representations, that the grantor intended the property against which the servitude is implied to be subject to the same servitudes imposed on all of the properties within the plan of development;[13] (4) the property owner against whom the restriction is enforced has actual or constructive notice of the implied servitude;[14] (5) the party seeking to enforce the restriction possesses an interest in property in the development that is subject to the servitude and has reasonably relied upon the representations or implied representations of the common grantor that other properties within the general scheme of development will be subject to the

---

[12] See *Egan v. Catholic Bishop, supra* note 11, 219 Neb. at 370, 363 N.W.2d at 384 (stating that doctrine applies where common grantor "by numerous conveyances incorporates in the deeds substantially uniform restrictions, conditions, and covenants against the use of the property"). See, also, *Patch v. Springfield School Dist.*, 187 Vt. 21, 33, 989 A.2d 500, 508 (2009) (requiring for application of doctrine that "'vast majority of subdivided lots contain restrictive covenants which reflect the general scheme'").

[13] See, *Skyline Woods Homeowners Assn. v. Broekemeier, supra* note 11; *Egan v. Catholic Bishop, supra* note 11; *Nashua Hospital v. Gage, supra* note 10, 85 N.H. at 339, 159 A. at 139 (requiring that "'restrictions were intended by the common vendor to be and were for the benefit of all the lots intended to be sold'").

[14] See, *Skyline Woods Homeowners Assn. v. Broekemeier, supra* note 11, 276 Neb. at 811, 758 N.W.2d at 390-91 ("'[t]he recording acts have not abolished the equity rule as to actual and constructive notice.' Under this rule, we consider whether there are circumstances which, in the exercise of common reason and prudence, ought to put a man upon particular inquiry. If so, then the purchaser will be charged with notice of every fact which an inquiry, if made, would have given him or her"); *Egan v. Catholic Bishop, supra* note 11.

servitude;[15] and (6) injustice can be avoided only by implying the servitude.[16]

[8-10] While the doctrine of implied reciprocal negative servitudes has a long pedigree and is well established,[17] courts tend to use it only with great trepidation. We have said that the law disfavors restrictions on the use of land.[18] As one court reasoned, "Logically, if express restrictive covenants are disfavored under the law, implied restrictive covenants are to be viewed with even less favor."[19] We have also said that because implied restrictive covenants mandate relaxation of the writing requirement, courts are generally reluctant and cautious to conclude implied restrictive covenants exist.[20] As another court said, "the doctrine [of implied reciprocal negative servitudes] should be applied with extreme caution because in

---

[15] See, *Skyline Woods Homeowners Assn. v. Broekemeier, supra* note 11; *Egan v. Catholic Bishop, supra* note 11. See, also, *Ski Masters of Texas, LLC v. Heinemeyer*, 269 S.W.3d 662, 669 (Tex. App. 2008) ("[q]uestions about standing are implicated whenever a property owner seeks to enforce such a restrictive covenant. Standing essentially depends on two things: (1) the existence of a general plan or scheme of development (2) that was part of the inducement for purchasers to obtain land within the restricted area") (citing *Hooper v. Lottman*, 171 S.W. 270 (Tex. App. 1914)).

[16] 1 Restatement, *supra* note 6, § 2.14(2)(b). See, also, *Sullivan v. O'Connor*, 81 Mass. App. 200, 961 N.E.2d 143 (2012). Cf. *Mountain High Homeowners Assn. v. J.L. Ward*, 228 Or. App. 424, 438, 209 P.3d 347, 355 (2009) (limiting creation of implied equitable servitudes by estoppel to where "establishment of a servitude is necessary to avoid injustice").

[17] E.g., *Evans v. Pollock, supra* note 10, 796 S.W.2d at 466 ("implied reciprocal negative easement doctrine has long been recognized in many jurisdictions").

[18] See, *Latenser v. Intercessors of the Lamb, Inc.*, 250 Neb. 789, 553 N.W.2d 458 (1996); *Egan v. Catholic Bishop, supra* note 11.

[19] *Collins v. Rodgers*, 938 So. 2d 379, 385 (Ala. 2006).

[20] *Skyline Woods Homeowners Assn. v. Broekemeier, supra* note 11.

effect it lodges discretionary power in a court to deprive a [person] of his [or her] property by imposing a servitude through implication."[21] Some courts, in agreement with the Restatement drafters, require clear and convincing evidence to establish that a property is subject to the restrictions of an implied reciprocal negative servitude.[22]

[11,12] Whether a general plan or scheme of development exists and the scope and boundary of that plan are questions of fact.[23] The Restatement commentary explains:

Representations by the developer normally provide the basis for finding that land was conveyed pursuant to a general plan of development. The representations may take the form of direct expressions that the project is a planned development, a restricted community, a quality residential subdivision, or the like. Representations may be found in advertisements, brochures, or statements

---

[21] *Galbreath v. Miller*, 426 S.W.2d 126, 128 (Ky. 1968). See, also, *Land Developers, Inc. v. Maxwell*, 537 S.W.2d 904, 913 (Tenn. 1976) (stating that doctrine should be applied with ""extreme caution""); *Saccomanno v. Farb*, 492 S.W.2d 709, 713 (Tex. App. 1973) (stating that doctrine should be applied with "extreme caution").

[22] 1 Restatement, *supra* note 6, § 2.14, comment *f*. See, also, *The Greylag 4 Maint. Corp. v. Lynch-James*, No. CIV.A. 205-N, 2004 WL 2694905 at *5 (Del. Ch. Oct. 6, 2004) (requiring "the party asserting the common plan doctrine [to] show, by clear and convincing evidence, that a common plan in fact existed") (citing *Leon N. Weiner & Associates v. Krapf*, 623 A.2d 1085 (Del. 1993)); *Joslyn v. Woods*, No. 2001-CA-000320-MR, 2003 WL 1246955 (Ky. App. Feb. 14, 2003) (requiring proof by clear and convincing evidence for doctrine of implied reciprocal easements) (citing *Bellemeade Company v. Priddle*, 503 S.W.2d 734 (Ky. 1973)); *McKenrick v. Savings Bank*, 174 Md. 118, 128, 197 A. 580, 585 (1938) (requiring "clear and satisfactory proof" to establish existence of general scheme of development and that land in question was intended by common grantor to be subject to restrictions as part of scheme).

[23] 1 Restatement, *supra* note 6, § 2.14, comment *f*.; *Ski Masters of Texas, LLC v. Heinemeyer, supra* note 15.

made by sales personnel. Indirect representations may be found in maps, or pictures displayed to prospective purchasers. Representations may also be found in the language or nature of the servitudes imposed on the lots conveyed.[24]

We said in *Skyline Woods Homeowners Assn. v. Broekemeier*[25] that a grantor's intent to create a plan of development may be proved "from the conduct of parties or from the language used in deeds, plats, maps, or general building development plans" and by looking "'to matters extrinsic to related written documents, including conduct, conversation, and correspondence.'"

[13] Determining which properties are included within a plan of development is relatively easy where land is platted or subdivided, because "[i]n the absence of other evidence, the inference is normally justified that all of the land within a platted subdivision is subject to the general plan, and that land outside the subdivision is not included."[26] Thus, where property is subdivided or platted pursuant to a plan of development, a presumption arises that the plan of development includes only those properties in the plat or subdivision.[27]

[14,15] The property included within a plan of development, for purposes of the doctrine, does not necessarily include all

---

[24] 1 Restatement, *supra* note 6, § 2.14, comment *f.* at 185. See, also, generally, *Country Community v. HMW Special Utility*, 438 S.W.3d 661 (Tex. App. 2014); *Swanson v. Green*, 572 So. 2d 1246 (Ala. 1990).

[25] *Skyline Woods Homeowners Assn. v. Broekemeier, supra* note 11, 276 Neb. at 805, 758 N.W.2d at 387.

[26] 1 Restatement, *supra* note 6, § 2.14, comment *g.* at 187. See, also, generally, *Roper v. Camuso*, 376 Md. 240, 261, 829 A.2d 589, 602 (2003) ("cases considering implied restrictions on land retained by a common grantor have turned on two key inquiries: whether (1) there was a general plan of development, and (2) if so, the retained land was intended to be a part of the development").

[27] See 1 Restatement, *supra* note 6, § 2.14, comment *g.*

of the developer's land, but can be limited to "certain well-defined similarly situated lots."[28] And where a development is subdivided or platted in separate phases, each phase constitutes its own separate plan of development.[29]

In addition to the aforementioned limitations on the scope of this doctrine, there is another limitation on its application that is key to the resolution of the case at bar.

### (b) Gap-Filling Function of Doctrine

The doctrine of implied reciprocal negative servitudes functions as a gap-filler. It is an equitable doctrine created to protect property owners. Where a property owner purchases a lot from a developer that is subject to a restrictive covenant in the individual lot deed, but where the developer subsequently conveys a lot within the development without a restriction in the deed, the doctrine steps in to fill the gap. It fills the gap in order to protect the other property owners' reasonable expectations that all of the lots within the plan of development will be similarly restricted.

The doctrine arose in the historical context of a time in which developers typically restricted properties within a plan

---

[28] *Evans v. Pollock, supra* note 10, 796 S.W.2d at 471. See, also, *Byrd v. Mahrou*, No. 03-14-00441-CV, 2016 WL 3974702 (Tex. App. July 22, 2016).

[29] 1 Restatement, *supra* note 6, § 2.14, comment *g.* at 187 ("[w]hen a tract is developed in phases, with separate units or subdivisions, the imposition of servitudes in one phase should not give rise to the implication of reciprocal servitudes burdening the remaining units or subdivisions"). See, *Evans v. Pollock, supra* note 10; *Duvall v. Ford Leasing*, 220 Va. 36, 42, 255 S.E.2d 470, 473 (1979) (holding, in situation where development "was developed in stages, the various sections having been created from time to time over a period of many years by the recordation of a number of deeds of dedication and plats," that "each of these recordings created a separate and distinct subdivision, with its own set of restrictions benefiting and burdening only the land in that particular subdivision").

of development by placing restrictive covenants in each individual property deed. As one court explained:

> [T]he implied negative reciprocal easement or servitude doctrine arose before the advent of comprehensive zoning in order to provide a measure of protection for those who bought lots in what they reasonably expected was a general development in which all of the lots would be equally burdened and benefitted. In those early days, it was uncommon for the developer to evidence the development or impose uniform restrictions through a recorded Declaration that would later be incorporated in individual deeds. They often filed subdivision plats of one kind or another but did not take the extra step of using one instrument to impose the restrictions. The common, almost universal, practice, instead, was for the developer to place the restrictions in the deeds to individual lots and, sometimes, to represent to the purchasers of those lots that the same restrictions would be placed in subsequent deeds to the other lots. Litigation arose most frequently when the developer then neglected to include the restrictions in one or more of the subsequent deeds and those buyers proceeded or proposed to use their property in a manner that would not be allowed by the restrictions.[30]

Because developers historically restricted properties as part of their plan of development on a deed-by-deed basis, the doctrine was created to fill the gap where a property was conveyed without restrictions in the deed.

But a common practice today is for developers to place restrictions on an entire development all at once through

---

[30] *Schovee v. Mikolasko, supra* note 10, 356 Md. at 107-08, 737 A.2d at 586 (citing Restatement (Third) of Property: Servitudes § 2.14, comment *b*. (Tentative Draft No. 1, 1989)).

executing and recording a declaration of restrictions.[31] Where this occurs, there is no need for the doctrine's gap-filling function. The drafters of the Restatement took the position that the doctrine has no application where a development's restrictions are created through a declaration of restrictions rather than through restrictive covenants placed in individual lot deeds:

> The idea underlying the [implied-reciprocal-servitude] doctrine is that when a purchaser buys land subject to restrictions imposed to carry out a general plan of development, the purchaser is entitled to assume that all the land in the development is, or will be, similarly restricted to carry out the general plan. By selling land with restrictions designed to put into effect a general plan of development, the developer impliedly represents to the purchasers that the rest of the land included in the plan is, or will be, similarly restricted. That representation is enforced, on the grounds of estoppel, by imposing an implied reciprocal servitude on the developer's remaining land included in the plan. Because the implied-reciprocal-servitude doctrine undercuts the Statute of Frauds and creates uncertainty in land titles, it should be applied only when the existence of a general plan is clear and establishment of the servitude is necessary to avoid injustice.
>
> *The implied-reciprocal-servitude doctrine comes into play only when the developer does not follow the practice of recording a declaration of servitudes applicable to the entire subdivision or other general-plan area.* The

---

[31] See Black's Law Dictionary 495 (10th ed. 2014) (defining "declaration of restrictions" as "statement of all the covenants, conditions, and restrictions affecting a parcel of land, usu[ally] imposed and recorded by a developer of a subdivision. The restrictions usu[ally] promote a general plan of development by requiring all lot owners to comply with the specified standards, esp[ecially] for buildings. The restrictions run with the land").

doctrine protects the interests of purchasers who relied on continued effectiveness of the general plan when the developer decides to deviate from the general plan of development before all lots have been sold. If the purchasers have reasonably relied on the implied representations that all lots will be sold subject to the general-plan restrictions, and injustice can only be avoided by establishment of the implied servitude, the purchasers are entitled to the protection of an implied reciprocal servitude burdening the lots remaining in the developer's hands.[32]

[16] We agree with the Restatement that the doctrine of implied reciprocal negative servitudes has no application where a developer follows the practice of creating restrictions on a development through a declaration of restrictions. We agree with this approach because it furthers the interests of protecting the reasonable expectations of property purchasers and promoting reliance on our property recording system.

[17] A buyer of property has no reasonable expectation that neighboring property will be restricted as part of a plan of development where the entire development has been restricted through a declaration of restrictions that does not include that neighboring property. Such a buyer knows, or should know, that the neighboring property is not a part of the development and not necessarily subject to the same restrictions as the buyer's property.

_____

[32] 1 Restatement, *supra* note 6, § 2.14, comment *i*. at 191 (emphasis supplied). See, also, *Save Sea Lawn Acres Ass'n v. Mercer*, 140 Wash. App. 411, 422, 166 P.3d 770, 776 (2007) (stating that "implied-reciprocal-servitude doctrine applies only when the developer does not follow the practice of recording a declaration applicable to the entire subdivision or general-plan area"). But see, *Roper v. Camuso, supra* note 26; *Schovee v. Mikolasko, supra* note 10 (declining to adopt Restatement's categorical rule that doctrine does not apply where developer uses declaration, but, instead, creating strong presumption that doctrine does not apply beyond scope of declaration).

[18] The purpose of the doctrine is to protect the reasonable expectations of purchasers of property who reasonably rely on the representations or implied representations of a developer that the other properties within a development will be restricted. But the need for implied restrictions is obviated when the entire plan of development is restricted at once with a declaration of restrictions. A purchaser of property within such a development knows precisely what properties are—and what properties are *not*—subject to the same restrictions. The buyer can look at the records. The declaration tells the buyer what the restrictions are and to what properties they apply. Where the restrictions of a development are imposed all at once through a declaration of restrictions, the doctrine of implied reciprocal negative servitudes is not necessary to protect reasonable expectations of property buyers, because the buyer knows exactly what he or she is getting.

[19] Limiting the scope of the implied reciprocal servitudes doctrine to situations where restrictive covenants are placed in individual deeds also serves the interest of promoting reliance on our property recording system. By definition, an *implied* servitude is not written and recorded. A prospective property purchaser cannot trek down to the local register of deeds and see if there are any *implied* servitudes on a particular piece of property. The potential for unwritten, unrecorded, implied servitudes creates uncertainty. This uncertainty is at odds with our recording system, which aims to yield clear answers about the ownership of property. Where a purchaser of property can find a recorded declaration of restrictions, showing the scope of a development's restrictions, the purchaser should be able to rely on that information.

The doctrine of implied reciprocal negative servitudes does not apply where the grantor restricts all of the properties within a planned development through a declaration of restrictions. Where the grantor uses a declaration, the express restrictions within the declaration control within the plan of

development. The doctrine does not apply to property outside the planned development.

Here, the restrictive covenants placed on the Adamy subdivision were created through a plat and declaration in 1976. The restrictions were put in place as to all of the lots within the planned development. At the time the plaintiffs purchased their lots within the subdivision, the plat and declaration document was on file with the Butler County register of deeds. All of the plaintiffs had the opportunity to look at that record. Had they done so, they would have seen that the Colford Property was not a part of their subdivision and not subject to the same restrictions. With this information available, the plaintiffs had no reasonable expectation that the Colford Property would be subject to the Adamy subdivision restrictions, regardless of what any real estate sales brochures may have implied. We affirm the district court's grant of summary judgment.

### 3. THE PLAINTIFFS' NUISANCE AND CONSPIRACY CLAIMS

The plaintiffs' nuisance and conspiracy claims are premised on the alleged violation of the Adamy subdivision restrictive covenants. Because we conclude that these restrictions do not apply to the Colford Property through the doctrine of implied reciprocal negative servitudes, these claims fail as a matter of law. We affirm the district court's order granting summary judgment on these claims.

### VI. CONCLUSION

For the reasons set forth in this opinion, we affirm the judgment of the district court.

AFFIRMED.

CASSEL, J., participating on briefs.